

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

JAN -5 ????

CENTRAL DISTRICT OF CALIFORNIA
BY ____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| STEVEN TYRONE MILLER,<br><br>    Petitioner,<br><br>    v.<br><br>WARDEN M.C. KRAMER,<br><br>    Respondent. | No. CV 04-3389-GW (AGR)<br><br>ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |

Pursuant 28 U.S.C. § 636, the Court has reviewed the entire file de novo, including the Petition, the Magistrate Judge's Report and Recommendation, the Objections to the Report and Recommendation, and all records in the file.  Having made a de novo determination, the Court agrees with the recommendation of the Magistrate Judge.

IT IS ORDERED that Judgment be entered denying the Petition and dismissed this action with prejudice.

DATED: _January 5, 2009_

_____
GEORGE H. WU
UNITED STATES DISTRICT JUDGE

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

OCT 1 1 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                                        DEPUTY

1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **CENTRAL DISTRICT OF CALIFORNIA**

10                              **WESTERN DIVISION**

11  STEVEN TYRONE MILLER,              )    No. CV 04-3389-GW (AGR)
                                       )
12              Petitioner,            )
                                       )    REPORT AND RECOMMENDATION
13          v.                         )    OF UNITED STATES MAGISTRATE JUDGE
                                       )
14  WARDEN M.C. KRAMER,                )
                                       )
15              Respondent.            )
                                       )
16  _____)

17          The Court submits this Report and Recommendation to the Honorable George H.

18  Wu, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order No.

19  05-07 of the United States District Court for the Central District of California.  For the

20  reasons set forth below, the Magistrate Judge recommends that the Petition for Writ of

21  Habeas Corpus be denied.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

I.

## SUMMARY OF PROCEEDINGS

In April 1998, a jury in Los Angeles County convicted Petitioner of possession of a controlled substance, to wit, phencyclidine (PCP) in violation of Cal. Health & Safety Code § 11377(a) (Count 1), possession of a deceptive government document in violation of Cal. Penal Code § 529.5(c) (Count 2), driving under the influence of alcohol or drugs in violation of Cal. Vehicle Code § 23152(a) (Count 3), and transportation of PCP in violation of Cal. Health & Safety Code § 11379.5 (Count 4). (CT 205-08, 216-17.)[1] In a bifurcated proceeding, the trial court found Petitioner had suffered three prior serious or violent convictions within the meaning of California's Three Strikes Law (Cal. Penal Code §§ 667(b)-(i), 1170.12(a)-(d)) and sentenced him to 25 years to life in state prison. (CT 217, 278-81; RT 592:19-93:2.)[2]

The California Court of Appeal (CT 282) affirmed the judgment of conviction and sentence in an unpublished opinion filed December 3, 2001. *People v. Miller*, 2001 WL 1528644 (2001); (LD 5-8.). The California Supreme Court denied his petition for review on February 13, 2002. (LD 9; LD 18.)

Petitioner filed a state habeas corpus petition in the Los Angeles County Superior Court, which was denied on September 24, 2002. (LD 11-12.) The California Court of Appeal denied his habeas corpus petition on September 17, 2003. (LD 13-16.) Petitioner then sought review of the Court of Appeal's decision, or, alternatively, habeas corpus relief. The California Supreme Court denied review on December 17, 2003. (LD 17; LD 10.)

Pursuant to 28 U.S.C. § 2254, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody in the Eastern District of California on April 19, 2004, which was subsequently transferred to this Court. On July 15, 2004, Respondent filed a

---

[1] "CT" refers to the Clerk's Transcript.

[2] "RT" refers to Reporter's Transcript.

Motion to Dismiss the Petition on the grounds that it was untimely and contained unexhausted claims.  On July 22, 2004, Petitioner filed a state habeas petition in the California Supreme Court, which was denied on June 22, 2005, with a citation to *In re Clark*, 5 Cal. 4th 750, 21 Cal. Rptr. 2d 509 (1993).  (LD 19-20.)

On October 22, 2004, the Court found that the Petition was not time-barred.  On December 27, 2004, after receiving from Petitioner a document entitled "Notice of Abandonment of Unexhausted Claims and Request that the Court Stay those Claims it Finds Exhausted," the Court granted Petitioner's request for a stay of the then-exhausted Petition and allowed him to return to state court to exhaust his unexhausted claims.

On September 6, 2005, Petitioner filed a Motion to Amend his federal habeas Petition and lodged a proposed Amended Petition.  On September 30, 2005, Respondent filed an Opposition to the Motion to Amend on the ground that the Amended Petition contained four unexhausted claims.  Petitioner filed a response to the motion on January 23, 2006.

On April 17, 2006, this Court granted Petitioner's Motion to Amend as to all claims except the four unexhausted claims.[3]  In addition, Petitioner's request that he be granted a stay so he could exhaust these claims was denied.

The following are the exhausted claims in the Amended Petition:

Ground One – Ineffective assistance of appellate counsel;

---

[3]   The four unexhausted claims were: (1) the argument in Claim Twelve that Petitioner's waiver of counsel at his sentencing was not voluntary, knowing and intelligent, and that the trial court erred in allowing Petitioner to represent himself; (2) the argument in Claim Thirteen that Petitioner was denied effective assistance of counsel at sentencing when counsel did not secure rulings on two motions under Cal. Penal Code § 654 to dismiss strikes that arose from a single incident; (3) the argument in Claim Fourteen that the prosecutor improperly appealed to class or race when she stated in closing argument that "[t]hese people aren't so private, so shy"; and (4) the argument in Claim Fourteen that the prosecutor's misstatement of the law regarding circumstantial evidence reduced the government's burden of proof.

1    Ground Two – Denial of participation in California's deferred entry of judgment
2    program violated Petitioner's rights to equal protection, due process and the separation
3    of powers doctrine.  Trial counsel rendered ineffective assistance for failing to inform
4    him of the mistake in determining his eligibility for the program.  Petitioner was denied a
5    meaningful right to appeal the prosecutor's determination that he was ineligible for the
6    program;

7    Ground Three – Petitioner was denied his right to be personally present at all trial
8    proceedings.  Defense counsel was ineffective for failing to object to the trial court's
9    finding that Petitioner had voluntarily absented himself, failing to ask for a continuance
10   of an hour so that he could contact Petitioner, and failing to inform Petitioner of the
11   events that transpired during his absence;

12   Ground Four – The trial court's preliminary instruction on circumstantial evidence
13   denied him the presumption of innocence, lowered the prosecution's burden of proof,
14   and failed to give the legal definition of the term "inference";

15   Ground Five – The trial court erred in granting the prosecution's ex-parte request
16   to delay disclosure of rebuttal witness Howard Norman, and counsel was ineffective in
17   connection with Norman's testimony;

18   Ground Six – The trial court's use of CALJIC No. 12.02 allowed the jury to find
19   Petitioner guilty of Counts 1 and 4 by relying on facts found only by a preponderance of
20   the evidence;

21   Ground Seven – The trial court erred in allowing a police officer to use findings
22   from Horizontal Gaze Nystagmus testing as a basis for his opinion that Petitioner was
23   driving under the influence of PCP.  Petitioner received ineffective assistance of counsel
24   on this issue;

25   Ground Eight – The addition of Count 4 violated Petitioner's right to notice of the
26   charges against him.  Counsel rendered ineffective assistance in connection with the
27   addition of this count;

28

1    Ground Nine – The trial court violated Petitioner's constitutional rights by

2    instructing the jury with CALJIC No. 3.01 on aiding and abetting;

3    Ground Ten – Counsel was ineffective for failing to request an instruction on

4    voluntary intoxication;

5    Ground Eleven – The prosecutor committed misconduct by using false testimony

6    to gain a conviction and by falsely suggesting that Archie Hill had nothing to lose by

7    testifying the PCP was his, and not Petitioner's;

8    Ground Twelve – Counsel rendered ineffective assistance at the initial sentencing

9    hearing by failing to investigate the proposed testimony of Officer Mourot, failing to

10   investigate mitigating character letters, indicating that the defense would pay for Officer

11   Mourot's expenses, and failing to inform Petitioner of his right to compulsory process to

12   obtain testimony of out-of-state witnesses;

13   Ground Thirteen – Counsel was ineffective at his second sentencing hearing.  The

14   trial court's ruling at the initial sentencing hearing requiring Petitioner to pay for Officer

15   Mourot's expenses denied Petitioner's right to present a defense;

16   Ground Fourteen – The prosecutor committed misconduct in closing argument by

17   arguing Larry Corn had a motive to lie, arguing Petitioner knew the PCP was in the car

18   and suggesting he was lying, misstating the law on illegal possession of a controlled

19   substance, and vouching for the credibility of government witnesses;

20   Ground Fifteen – The evidence was insufficient to prove that Petitioner knowingly

21   possessed or transported the PCP; and

22   Ground Sixteen – Petitioner's sentence of 25 years to life was cruel and unusual

23   punishment in violation of the Eighth Amendment.

24   Respondent filed an Answer ("Ans.") to the Amended Petition on August 23, 2006.

25   Although Respondent did not claim the Petition was barred by failure to exhaust

26   remedies, the *Teague* doctrine, or statute of limitations (Ans. at 3),  Respondent

27

28

1   claimed Grounds One and Three through Fourteen were subject to California's

2   untimeliness bar.[4]  (*Id.* at 2.)  Petitioner filed a Reply on April 30, 2007.

## II.

## STATEMENT OF FACTS

Below are the facts set forth in the California Court of Appeal decision on direct review.[5]  To the extent an evaluation of Petitioner's claims for relief depends on an examination of the record, the Court has made an independent evaluation of the record specific to Petitioner's claims for relief.

On May 23, 1997, around 4:20 a.m., while on vehicle patrol, Culver City Police Officer Allen Azran and Sergeant Carlos Reynosa effected a traffic stop of a 1997 black Lexus which had just turned westbound on Venice Boulevard from northbound Sepulveda Boulevard.  The Lexus had no front license plate and had been swerving

---

[4]  Respondent is incorrect.  Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).  A state procedural rule constitutes an adequate bar to federal review if it was "firmly established and regularly followed" at the time it was applied by a state court.  *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991).

The California Supreme Court denied the habeas petition with a citation to *Clark*, which bars consideration of habeas claims filed after a significant, unjustified delay.  Since Respondent pleaded this procedural bar (Ans. at 19-24), the burden shifted to Petitioner.  *King v. Lamarque*, 464 F.3d 963, 967 (9th Cir. 2006).  Petitioner satisfied his burden by "simply contesting the adequacy" of the rule.  *Id.*; (Reply at 22-27.)  The burden then shifted back to Respondent to show that the timeliness rule has become sufficiently clear and consistently applied to justify barring federal review of Grounds One and Three through Fourteen.  *See id.* ("Here, because we held in [*Morales v. Calderon*, 85 F.3d 1387 (9th Cir.), *cert. denied*, 519 U.S. 1001 (1996)] that the California timeliness rule was insufficiently clear, the government must show on remand that the rule has since been clarified for noncapital cases and that the clarified rule has since been consistently applied.").  Respondent did not do so, and the claims will be addressed on the merits.  *Leavitt v. Arave*, 383 F.3d 809, 831-32 (9th Cir. 2004), *cert. denied*, 545 U.S. 1105 (2005).

[5]  *Miller*, 2001 WL 1528644 at *1-2.

within the number two and three lanes. The driver, Petitioner, only had one hand on the steering wheel, and the driver's seat was reclined in such a way that it was almost impossible for him to see over the car hood.

When Azran asked for his driver's license and registration, he noticed a cup containing an alcoholic beverage and bottle of gin in the center console area. As Petitioner exited the car, he had difficulty walking and balancing. Also, his eyes displayed a "blank-stare look[.]" This was one of the symptoms exhibited by someone under the influence of PCP. Another was the distinct odor of PCP which Petitioner strongly exuded. Such odor was the most objective symptom distinguishing someone under the influence of PCP as opposed to an alcoholic beverage. Additionally, Petitioner's speech was slurred, slow, and at times "incoherent[,]" and his eyes exhibited signs of nystagmus.

Based on their observations and training, Azran and Reynosa opined Petitioner was under the influence of PCP. Azran further opined Petitioner's impaired condition prevented him from driving safely.

A piece of foil folded in the shape of cigarettes was found on the floor mat directly below and in front of the driver's seat. The partly open foil packet partially exposed two cigarettes which had been dipped in PCP and thereby stained "very dark[,] like a brown color" and had a "wet appearance as well." The PCP in the cigarettes was a usable amount. A single PCP cigarette is the customary dosage.

At the police station, Petitioner repeatedly refused to respond to questions, sign a booking slip containing identification information, or supply a urine sample. He also refused to sign the admonition that he had no right to refuse to take a urine test to check for the presence of a controlled substance and that his refusal to take that test could be used as evidence of his consciousness of guilt.

Petitioner's defense theory was that he was under the influence of an alcoholic beverage, not PCP; that he emanated the odor of PCP, because his friend Archie Hill

1 | smoked a PCP cigarette while in the Lexus; and that the two recovered PCP cigarettes
2 | belonged to Hill.

3 | Petitioner testified that earlier that night he had shared two bottles of champagne
4 | with Hill and another friend at a club and also consumed two or three shots of Hennessy
5 | and two gins with fruit juice.

6 | Petitioner denied seeing any PCP on the car floor in front of his legs, but he did
7 | recall an officer showing him the foil packet and saying, " 'Ooh, look what we have
8 | here.' "  He denied that he knew what it was or that the PCP belonged to him.  He
9 | testified that before the officer displayed the foil and cigarettes, he had never seen
10 | either before.

11 | Petitioner admitted that he was arrested for possession of PCP.  He further
12 | admitted that he could recognize PCP on sight, because he had seen it before, and that
13 | he was acquainted with PCP's odor.  However, he did not recall seeing any PCP that
14 | night, and denied that Hill mentioned anything about PCP.  He further denied that he
15 | ever smoked PCP.  Although he was not sure if the officers requested a urine sample,
16 | Petitioner admitted he did not provide one.

17 | Azran testified that when he showed the PCP cigarettes to Reynosa, Petitioner did
18 | not say anything.  Azran denied saying, "'oh, look what we found.'"  He also testified
19 | that he did not recall seeing a lighter, change, or similar objects when he retrieved the
20 | cigarettes from the car floorboard.

21 | **III.**

22 | **STANDARD OF REVIEW**

23 | A federal court may not grant a petition for writ of habeas corpus by a person in
24 | state custody with respect to any claim that was adjudicated on the merits in state court
25 | unless it (1) "resulted in a decision that was contrary to, or involved an unreasonable
26 | application of, clearly established Federal law, as determined by the Supreme Court of
27 | the United States"; or (2) "resulted in a decision that was based on an unreasonable
28 | determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d); *Woodford v. Visciotti*, 537 U.S. 19, 21, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam); *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007).

"'[C]learly established Federal law' . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court rendered its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). A state court's decision is "contrary to" clearly established Federal law if (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts . . . materially indistinguishable" from a decision of the Supreme Court but reaches a different result. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

Under the "unreasonable application prong" of section 2254(d)(1), a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Lockyer*, 538 U.S. at 76; *see also Woodford*, 537 U.S. at 24-26 (state court decision "involves an unreasonable application" of clearly established federal law if it identifies the correct governing Supreme Court law but unreasonably applies the law to the facts).

A state court's decision "involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle . . . to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

"In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" *Id.* (citation omitted); *see also Earp v. Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 2295 (2006).

"[S]tate court factual findings are presumed correct in the absence of clear and convincing evidence to the contrary." *Mitleider v. Hall*, 391 F.3d 1039, 1046 (9th Cir. 2004), *cert. denied*, 545 U.S. 1143 (2005); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ( "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).").

In applying these standards, this Court looks to the last reasoned state court decision. *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006). To the extent no such reasoned opinion exists, as when a state court rejected a claim in an unreasoned order, this Court must conduct an independent review to determine whether the decisions were contrary to, or involved an unreasonable application of, "clearly established" Supreme Court precedent. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). If the state court declined to decide a federal constitutional claim on the merits, this Court must consider that claim under a *de novo* standard of review rather than the more deferential "independent review" of unexplained decisions on the merits authorized by *Delgado*. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim state court did not reach on the merits).

Here, the California Supreme Court reached the merits of Grounds Fifteen and Sixteen when it denied Petitioner's first petition for review without citation to authority or analysis. *Gaston v. Palmer*, 417 F.3d 1030, 1038 (9th Cir. 2005), *amended* 447 F.3d 1165 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 979 (U.S. 2007); *Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir. 1992), *cert. denied*, 510 U.S. 887 (1993). Its denials are presumed to rest upon the same grounds as those discussed in the opinion of the California Court of Appeal, which is the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991). Thus, in

1  addressing Grounds Fifteen and Sixteen, this Court will consider the opinion of the
2  California Court of Appeal to determine if its holdings were contrary to, or an
3  unreasonable application of, clearly established federal law. *Davis*, 443 F.3d at 1158.
4  In addition, the California Supreme Court rejected the ineffective assistance of counsel
5  claim in Ground Two on the merits when it denied Petitioner's second petition for
6  review, and the California Court of Appeal rejected Grounds One, Eight, and Thirteen
7  on their merits when it denied Petitioner's habeas corpus petition. *Gaston*, 417 F.3d at
8  1038. In applying the AEDPA standard to the ineffective assistance of counsel claim of
9  Ground Two, this Court will look to the decision of the Court of Appeal, which denied it
10 in its September 17, 2003 order rejecting Petitioner's habeas corpus petition. *Davis*,
11 443 F.3d at 1158. However, since grounds One, Eight, and Thirteen were rejected in
12 an unreasoned order, this Court must conduct an independent review to determine
13 whether the decisions were contrary to, or involved an unreasonable application of,
14 "clearly established" Supreme Court precedent. *Delgado v. Lewis*, 223 F.3d 976, 982
15 (9th Cir. 2000). A *de novo* standard of review applies to the other claims. *Lewis*, 391
16 F.3d at 996.

## IV.

## DISCUSSION

A.  **GROUND TWO: Denial of Participation in the Deferred Entry of**
     **Judgment Program**[6]

21      Petitioner claims that his denial of participation in California's deferred entry of
22 judgment program violated (1) his right to equal protection, (2) the separation of powers
23 doctrine, and (3) his right to due process. Further, Petitioner argues that (4) trial
24 counsel rendered ineffective assistance for failing to inform him of the mistake in
25 determining his eligibility for the program, and (5) he was denied a meaningful right to

---

[6] Ground One will be addressed after Ground Sixteen.

appeal the prosecutor's determination that he was ineligible for the program. All of these claims fail.

Effective January 1, 1997, the California Legislature enacted the current deferred entry of judgment program, under which an eligible defendant can enter a plea of guilty, participate in a drug rehabilitation program, and, upon completion of the program, have the charges dismissed. Penal Code §§ 1000-1000.2; *People v. Laino*, 32 Cal. 4th 878, 896, 11 Cal. Rptr. 3d 723, *cert. denied*, 543 U.S. 886 (2004). The purpose of the program is "to 'divert' from the normal criminal process persons who are formally charged with first-time possession of drugs, have not yet gone to trial, and are found to be suitable for treatment and rehabilitation at the local level." *People v. Sharp*, 112 Cal. App. 4th 1336, 1340-41, 5 Cal. Rptr. 3d 771 (2003) (citation omitted).

Cal. Penal Code § 1000 provides, in relevant part:

(a) This chapter shall apply whenever a case is before any court upon an accusatory pleading for a violation of Section . . . 11377 . . . of the Health and Safety Code [or other enumerated drug offense], and it appears to the prosecuting attorney that . . . all of the following apply to the defendant:

(1) The defendant has no conviction for any offense involving controlled substances prior to the alleged commission of the charged offense.

(2) The offense charged did not involve a crime of violence or threatened violence.

(3) There is no evidence of a violation relating to narcotics or restricted dangerous drugs other than a violation of the sections listed in this subdivision.

(4) The defendant's record does not indicate that probation or parole has ever been revoked without thereafter being completed.

(5) The defendant's record does not indicate that he or she has successfully completed or been terminated from diversion or deferred entry of judgment pursuant to this chapter within five years prior to the alleged commission of the charged offense.

(6) The defendant has no prior felony conviction within five years prior to the alleged commission of the charged offense.

The initial determination that the defendant satisfies the six criteria in Cal. Penal Code § 1000 (a), as required to be eligible for a deferred entry of judgment, is made by the district attorney. See Cal. Penal Code § 1000(b) ("The sole remedy of a defendant who is found ineligible for deferred entry of judgment is a postconviction appeal."); see also People v. Sturiale, 82 Cal. App. 4th 1308, 1313-14, 98 Cal. Rptr. 2d 865 (2000) (trial courts have no power to overrule the district attorney's determination that the defendant is ineligible for the program).

In this case, on June 10, 1997, a Los Angeles County deputy district attorney executed a document entitled, "Declaration of Deputy District Attorney Deferred Entry of Judgment," in which he indicated that Petitioner was eligible for Cal. Penal Code § 1000 deferred entry of judgment, but handwrote, "Not suitable, however." (Am. Pet., Ex. 3.) At Petitioner's arraignment on June 27, 1997, the prosecutor explained that "[a]ccording to federal guidelines if there's prior strikes or incidents of violence, that renders a person ineligible. That's for drug court." (LD 15, Ex. 32 at 3:10-13.) Petitioner's priors included attempted murder, assault with a deadly weapon and robbery. (Id. at 3:15-19.)

On April 24, 1998, the information, which had initially included only the first three counts, (Id. at 1:19-26) was amended to add count 4 for transportation of PCP in violation of Cal. Health & Safety Code § 11379.5. (CT 41-44.)

The California Court of Appeal rejected Petitioner's argument on habeas that his counsel was ineffective for failing to inform him that he was eligible for deferred entry of judgment:

> The petition is denied. There was evidence, as of the June 27, 1997 hearing, that [P]etitioner had committed two narcotics-related offenses that disqualified him under Penal Code section 1000, subdivision (a)(3). (People v. Sturiale (2000) 82 Cal. App. 4th 1308, 1312-1316.). . . .

(LD 16.)

13

1              **1.   Equal Protection**

2         Petitioner argues he was denied equal protection of the law because the district

3   attorney created two classes.  Although both classes satisfied the statutory criteria for

4   deferred entry of judgment, one class was denied the benefit due to prior strikes.  (Am.

5   Pet. at 7.)  Petitioner claims he was erroneously denied deferred entry of judgment

6   because the allegation of prior convictions within the meaning of the Three Strikes law

7   does not render a defendant ineligible for participation in the program, relying on *People*

8   *v. Davis*, 79 Cal. App. 4th 251, 253, 93 Cal. Rptr. 2d 905 (2000).  (Am. Pet. at 6.)

9         The Fourteenth Amendment's equal protection clause mandates that "all persons

10   similarly situated should be treated alike."  *Tennessee v. Lane*, 541 U.S. 509, 522, 124

11   S. Ct. 1978, 158 L. Ed. 2d 820 (2004) (quoting  *Cleburne v. Cleburne Living Center*, 473

12   U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)).  Thus, "evidence of different

13   treatment of unlike groups does not support an equal protection claim."  *Thornton v. City*

14   *of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005); *Rostker v. Goldberg*, 453 U.S. 57,

15   79, 101 S. Ct. 2646, 69 L. Ed. 2d 478 (1981).  To raise an equal protection violation, a

16   litigant must allege he was similarly situated to others who received preferential

17   treatment, *Cleburne*, 473 U.S. at 439, and there was discriminatory motive or intent.

18   *Hernandez v. New York*, 500 U.S. 352, 362, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991);

19   *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999), *cert. denied*, 528 U.S. 1086

20   (2000).  "Generally, legislation is presumed to pass constitutional muster and will be

21   sustained if the classification drawn by the statute or ordinance is rationally related to a

22   legitimate state interest."  *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th

23   Cir. 1997); *see Cleburne*, 473 U.S. at 439-40.

24         A defendant may not participate in the deferred entry of judgment program if there

25   is "evidence of a violation relating to narcotics or restricted dangerous drugs other than

26

27

28

1   a violation of the sections listed in this subdivision."[7]  Cal. Penal Code § 1000(a)(3).  As

2   the Court of Appeal noted, there was evidence, as of the June 27, 1997 hearing, that

3   Petitioner had committed two narcotics-related offenses not listed in Cal. Penal Code §

4   1000(a), namely, driving under the influence of alcohol and a drug in violation of Cal.

5   Vehicle Code § 23152(a), and transporting PCP in violation of Cal. Health & Safety

6   Code § 11379.5.[8]  (LD 15, Ex. 32 at 1:19-26; LD 2 at 2 (Petitioner drove "while under

7   the influence of an alcoholic beverage and a drug and under their combined

8   influence"));  *see People v. Canty*, 32 Cal. 4th 1266, 1285, 14 Cal. Rptr. 3d 1 (2004)

9   (charge under Veh. Code § 23152(a) renders defendant ineligible); *People v.*

10  *Covarrubias*, 18 Cal. App. 4th 639, 642, 22 Cal. Rptr. 2d 475 (1993) (evidence of driving

11  under influence of cocaine is disqualifying even if not charged).  Even if Petitioner's

12  prior strikes or incidents of violence did not render Petitioner ineligible, evidence of

13  either drug-related violation did.  Because Petitioner does not challenge the

14  constitutionality of the classification drawn by Cal. Penal Code § 1000(a)(3) and has not

15  otherwise shown that he was treated differently from other similarly-situated individuals,

16  his equal protection claim fails.  *Thornton*, 425 F.3d at 1168; *Rostker*, 453 U.S. at 79.

---

17
18  [7] "Evidence" within the meaning of this statute:

19      means more than mere suspicion or rumor; it means . . . reports of actual instances
        of trafficking or other information showing that the defendant has probably committed
20      narcotics offenses in addition to those listed in the statute. [¶] . . . In this screening
        process, however, the district attorney's inquiry need not be limited to information
21      admissible at the full-fledged criminal trial. The files of the district attorney ordinarily
22      include relevant hearsay information derived from investigations into criminal activity
        . . .
23
24  *Sledge v. Superior Court*, 11 Cal. 3d 70, 75, 113 Cal. Rptr. 28 (1974) (footnotes omitted).

25
    [8] Although Count 4 was not added until after the June 27, 1997 hearing, there was
26  evidence at the time of the arrest that Petitioner was driving with PCP cigarettes in his car.
    (LD 1.) There is no requirement that a defendant be actually charged with a disqualifying
27  offense in order to be ineligible. *People v. Brackett*, 25 Cal. App. 4th 488, 500, 30 Cal.
28  Rptr. 2d 557 (1994).

### 2.  Separation of Powers

Petitioner claims the separation of powers was violated because the prosecutor "was vested with the authority to determine if [P]etitioner was suitable for deferred entry of judgment.  The exercise of such authority by the executive branch invades the exclusive power of the Judiciary to determine the appropriate sentence of individuals who commit criminal offenses."  (Am. Pet. at 8.)

The argument that the California Legislature, by delegating to the prosecutor the power to make the initial determination of eligibility, violated state principles of separation of powers, however, is not a cognizable claim.[9]  U.S. Const. art. III, § 1; *see Dreyer v. People of the State of Illinois*, 187 U.S. 71, 84, 23 S. Ct. 28, 47 L. Ed. 79 (1902) ("Whether the legislative, executive, and judicial powers of a state shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the state.").  This is true even if Petitioner's casts his argument as a due process claim. *See Moore v. Rowland*, 367 F.3d 1199, 1200 (9th Cir. 2004) (per curiam) ("[A] state's violation of its separation-of-powers principles does not give rise to a federal due process violation."); *Murtishaw v. Woodford*, 255 F.3d 926, 959-61 (9th Cir. 2001), *cert. denied*, 535 U.S. 935 (2002).

### 3.  Due Process

Petitioner contends that he was denied due process because, as a result of the prosecution's claim that his prior strikes precluded his participation in the deferred entry

///

///

---

[9]  The California Supreme Court has held that the district attorney's determination of eligibility under Cal. Penal Code § 1000 is not a judicial act and does not violate separation of powers. *Sledge*, 11 Cal. 3d at 73, 76.

16

1  of judgment program, he was not considered for the program, as mandated by Cal.

2  Penal Code § 1000.2.[10]  (Am. Pet. at 11-12.)

3        The due process clause of the Fourteenth Amendment prohibits a state from

4  arbitrarily depriving a person of a liberty interest in which the state has created a

5  legitimate expectation.  *Hicks v. Oklahoma*, 447 U.S. 343, 346, 100 S. Ct. 2227, 65 L.

6  Ed. 2d 175 (1980); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*,

7  442 U.S. 1, 7, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979).  Here, Petitioner did not have a

8  legitimate expectation in deferred entry of judgment because he was not eligible for the

9  program; therefore, there was no due process violation.  *See Greenholtz*, 442 U.S. at 7

10 (the mere hope of a benefit is not constitutionally protected).

11       **4.  Ineffective Assistance of Counsel**

12       Petitioner argues his counsel was ineffective for failing to discover that

13 Petitioner was erroneously denied consideration for participation in the program.  (Am.

14 Pet. at 22.)

15       To succeed on a claim of ineffective assistance of trial counsel, a habeas

16 petitioner must demonstrate his attorney's performance was deficient and that the

17 deficient performance prejudiced the defense.  *Williams v. Taylor*, 529 U.S. 362, 390,

18 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *Strickland v. Washington*, 466 U.S. 668,

19 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  The petitioner bears the burden of

20 establishing both components.  *Williams*, 529 U.S. at 390-91; *Smith v. Robbins*, 528

21 U.S. 259, 285-86, 120 S. Ct. 746, 145 L. Ed. 2d 746 (2000).  "Deficient performance is

22 performance which is objectively unreasonable under prevailing professional norms."

23

24     [10]  Cal. Penal Code § 1000.2 provides, in relevant part:

25       The court shall hold a hearing and, after consideration of any information relevant

26 to its decision, shall determine if the defendant consents to further proceedings under this chapter and if the defendant should be granted deferred entry of

27 judgment.  If the court does not deem the defendant a person who would be benefited by deferred entry of judgment, or if the defendant does not consent to

28 participate, the proceedings shall continue as in any other case.

1   *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 688).

2   Prejudice "focuses on the question whether counsel's deficient performance renders the

3   results of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v.*

4   *Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993); *Williams*, 529

5   U.S. at 393 n.17.

6          To establish deficient performance, petitioner must show his counsel "made errors

7   so serious that counsel was not functioning as the 'counsel' guaranteed the defendant

8   by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *Lankford v. Arave*, 468 F.3d

9   578, 583 (9th Cir. 2006).  In reviewing trial counsel's performance, the court will

10  "strongly presume[] [that counsel] rendered adequate assistance and made all

11  significant decisions in the exercise of reasonable professional judgment." *Strickland*,

12  466 U.S. at 690; *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S. Ct. 2574, 91 L. Ed.

13  2d 305 (1986).  Only if counsel's acts and omissions, examined within the context of all

14  the surrounding circumstances, were outside the "wide range" of professionally

15  competent assistance, will petitioner meet this initial burden. *Kimmelman*, 477 U.S. at

16  386; *Strickland,* 466 U.S. at 690.

17         If petitioner makes this showing, he must then establish there is a "reasonable

18  probability that, but for counsel's unprofessional errors, the result of the proceeding

19  would have been different." *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 391.  The

20  errors must not merely undermine confidence in the outcome of the trial, but must result

21  in a proceeding that was fundamentally unfair. *Williams*, 529 U.S. at 393 n.17;

22  *Lockhart*, 506 U.S. at 369.  However, a court need not determine whether counsel's

23  performance was deficient before determining whether the defendant suffered prejudice

24  as the result of the alleged deficiencies. *Strickland*, 466 U.S. at 697 ("If it is easier to

25  dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that

26  course should be followed.").

27         Given that Petitioner was ineligible for deferred entry of judgment, no prejudice

28  exists.  Accordingly, the California Supreme Court's denial of this ineffective assistance

1   of counsel claim was neither contrary to, nor an unreasonable application of, clearly

2   established federal law.

### 5.   Right to Meaningful Review

4   Petitioner argues that he was denied a meaningful right to review of the

5   prosecutor's determination that he was ineligible for deferred entry of judgment because

6   the Court of Appeal failed to address the operative question he presented to it in his

7   habeas petition: "Does the allegation of a strike prior disqualify a defendant from

8   participation in the deferred entry of judgment program?" (Am. Pet. at 14.) Instead, as

9   discussed above, the Court of Appeal determined there was no constitutional violation

10  because there was evidence that Petitioner had committed two narcotics-related

11  offenses that disqualified him under the program. (LD 16.)

12  "[I]f a State has created appellate courts as an integral part of the . . . system for

13  finally adjudicating the guilt or innocence of a defendant, the procedures used in

14  deciding appeals must comport with the demands of the Due Process and Equal

15  Protection Clauses of the Constitution." *Evitts v. Lucey*, 469 U.S. 387, 393, 105 S. Ct.

16  830, 83 L. Ed. 2d 821 (1985) (internal quotation marks and citation omitted).

17  Petitioner here does not argue that he was denied the right to a direct appeal.

18  Even if the *Evitts* principle applies to state habeas corpus petitions, Petitioner has failed

19  to show how the Court of Appeal denied his rights to due process and equal protection

20  by determining that he was ineligible for the program.[11]  *See James v. Borg*, 24 F.3d 20,

21

22  _____

23  [11]   Petitioner appears to argue that, even if the Court of Appeal was correct that he was
    ineligible, the Court of Appeal nevertheless erred by not limiting the scope of its review to

24  the specific reasons stated by the prosecutor's declaration. According to Petitioner, the
    Court of Appeal should have remanded for a proper determination of ineligibility. Although

25  Petitioner cites *People v. Hayes*, 163 Cal. App. 3d 371, 209 Cal. Rptr. 441 (1985), the
    *Hayes* decision remanded only after finding that "the district attorney's determination lacks

26  the requisite evidence." *Id.* at 375-76.   The court examined the preliminary hearing
    transcript (which was not cited in the declaration) and declined to consider only the

27  evidence outside the record.   *Id.* at 375.   By contrast, Petitioner's ineligibility is

28  ascertainable from the record before the trial court and the appellate court.

26 (9th Cir.) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.") (citation omitted), *cert. denied sub nom., James v. White*, 513 U.S. 935 (1994); *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995), *cert. denied*, 517 U.S. 1143 (1996).

## B.      GROUND THREE: Petitioner's Absence from Trial Proceedings

Petitioner argues he was denied his right to be personally present during a portion of the trial proceedings.  Further, Petitioner contends defense counsel was ineffective for failing to object to the trial court's finding that Petitioner had voluntarily absented himself, failing to ask for a continuance of an hour so that he could contact Petitioner, failing to object to the court's pre-instruction on direct and circumstantial evidence (CALJIC 2.00), failing to object to the prosecution's submission of a jury instruction to the court, and failing to inform Petitioner of the events that transpired during his absence.  (Am. Pet. at 24-30.)  All of these claims fail.

On April 20, 1998, after the jury was sworn in, the trial court ordered the jurors to return the following morning at 10:30 for pre-instructions and opening statements.  (RT 121:5-10.)  The court told the jurors the courtroom's telephone number, told everyone to write it down, and stated: "[I]f there is any problem that prevents you from being here when you are required to be here, please call the court and let us know what your status is, illness, mechanical problems with your car, transportation, anything of that sort.  Please call the court and let us know immediately."  (RT 122:1-18.)

After the jurors departed, the parties discussed the motions that needed to be made out of the presence of the jury pursuant to Cal. Evidence Code § 402.  The court told the parties to "please be ready to proceed tomorrow morning . . . at 10:00 a.m. on those motions."  (RT 125-126.)  It then instructed the prosecutor that she should have her witnesses at 11:00 the next morning.  (RT 126:22-26.)  Immediately before recessing for the evening, the court stated:

1     Okay, we'll be in recess in this matter until 10:00 tomorrow morning. [¶] ***Mr.***

2     ***Miller, you are ordered to return at that time with counsel.***[12] [¶] People are

3     also requested to return at that time.

4 (RT 128:8-13 (emphasis added).)

5     On April 21, 1998, at 10:30 a.m., both counsel were present in court but Petitioner

6 was not. (RT 129.) The court asked defense counsel whether his client was outside,

7 and defense counsel responded, "No, I didn't see him out there." (*Id.*) The court asked

8 defense counsel to "check and see if he's arrived yet." (*Id.*) Defense counsel indicated

9 that he had Petitioner's home telephone number and that he would call Petitioner. (RT

10 130:6-11.) Defense counsel reported that he called Petitioner's house but got no

11 answer. (RT 131:24-26.) In the interim, the prosecutor submitted a revised version of

12 CALJIC No. 12.02 as to the elements of Count 4. (RT 130; CT 194.)

13     The court noted that it was approximately 10:32 a.m. and that it had ordered

14 Petitioner to return at 10:00 a.m. (RT 132:11-13.) The court handled the pretrial

15 motions on which defense counsel was prepared to proceed without Petitioner's

16 presence. (RT 132:14-18.) Defense counsel first requested that the prosecution's

17 police officer witnesses be precluded from making "gratuitous statements" during their

18 testimonies, and the court reminded the prosecutor that answers to questions must be

19 responsive. (RT 132:28-134:16.) Defense counsel's second request was that the

20 prosecutor be admonished not to inquire into the specific facts underlying Petitioner's

21 prior convictions, and the court admonished the prosecutor accordingly. (RT 134:17-

22 136:11.)

23     After noting that the time was 10:45 a.m., the court made a determination that

24 Petitioner had voluntarily absented himself from the proceedings and indicated that it

25 would proceed with the trial. (RT 139:20-140:5.) The court gave defense counsel

26 additional time to go to the garage to look for Petitioner, and then read the pre-

27 _____

28    [12] Petitioner had been released on his own recognizance. (CT 131.)

instructions after counsel returned.  (RT 140:6-27.)  Petitioner finally arrived at approximately 10:50 a.m., roughly halfway through the pre-trial instructions.  (RT 186:13-16.)  Petitioner gave the following explanation for why he was late:

> [PETITIONER]: . . . I woke up at 6:00 o'clock this morning to make sure that I would be here on time.  I thought I knew how to get here from a certain area. [¶] I have three small children so I allowed time to dress them, take them to school and the baby-sitter.  I allowed that by waking up at 6:00 o'clock in the morning.  I was told to be here at 10:30; correct? . . .
>
> THE COURT: You were ordered to be here at 10:00.
>
> [PETITIONER]: I thought it was 10:30.  I thought it was 10:30, but I still wanted to make allowances for that.  That's why I woke up at 6:00 o'clock. [¶]  But what happened was I couldn't find my way here in essence.  But I know how to get here now.  So it's no problem.  It's no problem now.  I got kind of mixed-up.  When I left yesterday, I went a different way and kind of got mixed-up.  I thought I had it, but I didn't.  But I got it now, Your Honor, and I'm certainly sorry, and it won't happen again.

(RT 186:22-187:13.)

"[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987); *Campbell v. Rice*, 408 F.3d 1166, 1171 (9th Cir.), *cert. denied*, 546 U.S. 1036 (2005).  "The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985)(per curiam) (citation omitted);

*United States v. Long*, 301 F.3d 1095, 1102 (9th Cir. 2002) (per curiam) (citations omitted), *cert. denied sub nom.*, *Way Quoe Long v. United States*, 537 U.S. 1216 (2003).  The due process clause guarantees the defendant the right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Stincer*, 482 U.S. at 745 (citations omitted).  Thus, "an accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819-20 & n.15, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), *limited on other grounds in*, *Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000); *Rushen v. Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983).

On the other hand, there is no right to be present "'when presence would be useless, or the benefit but a shadow.'" *Stincer*, 482 U.S. at 745 (no right to be present during hearing to determine competency of prosecution's child witnesses); *Gagnon*, 470 U.S. at 526-27 (no right to be present during in camera examination of juror).  Any error is subject to harmless error analysis. *Campbell*, 408 F.3d at 1172 (citing *Rushen*, 464 U.S. at 117).

In non-capital cases in which the defendant is not in custody, however, the trial may continue where the defendant has voluntarily absented himself. *See Diaz v. United States*, 223 U.S. 442, 455, 32 S. Ct. 250, 56 L. Ed. 500 (1912) ("[W]here the offense is not capital and the accused is not in custody, the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present, and leaves the court free to proceed with the trial in like manner and with like effect as if he were present.");[13] *see also Brewer v. Raines*,

---

[13]   The Supreme Court reasoned that it did "'not seem to us to be consonant with the dictates of common sense that an accused person, being at large upon bail, should be at liberty, whenever he pleased, to withdraw himself from the courts of his country and to

23

670 F.2d 117, 119 (9th Cir. 1982) ("When, after sufficient notice, a defendant voluntarily absents himself from any proceeding, he waives any right he has to be present at that proceeding.").

Petitioner argues that his absence was not "voluntary" because he was confused and thought he was supposed to be at trial at 10:30 a.m. instead of 10:00 a.m. (Am. Pet. at 26.) The record indicates that the Court specifically instructed Petitioner to be present by 10:00 a.m. on April 21, 1998. (RT 128:8-13) Even assuming Petitioner thought the correct time was 10:30 a.m., he does not dispute that he did not arrive until approximately 10:50 a.m. (Am. Pet. 26-27.) Petitioner did not contact the courtroom or his attorney to advise that he was running late. The trial court's finding of voluntariness is presumptively correct. *Brewer*, 670 F.2d at 120. There is nothing in the record that overcomes the presumption.

Moreover, Petitioner's absence during approximately 20 minutes did not frustrate the fairness of the proceedings, and any error was harmless. *Faretta*, 422 U.S. at 819-20 & n.15; *Rushen*, 464 U.S. at 117. The court acted favorably to Petitioner on both of his counsel's motions. (RT 132:28-136:11.) Petitioner claims that, in his absence, the prosecution submitted a revised version of CALJIC No. 12.02, "which eliminated elements of the charged offense." (Am. Pet. at 28.) Petitioner's presence could not have prevented the prosecution from submitting a proposed jury instruction to the court. The court read its own version of 12.02 as a pre-instruction that simply deleted the verbs other than "transports" because they were irrelevant to the underlying case.[14] (RT 129:19-130:4, 138:26-139:19, 151.) Nor has Petitioner shown how his absence during the court's reading of half of the pre-instructions to the jury affected the outcome or

_____

break up a trial already commenced.'" *Diaz*, 223 U.S. at 457 (citation omitted).

[14]    The court rejected the prosecution's request for a modified CALJIC 12.02 instruction at the end of trial. (RT 455:17-457:17.) In deliberations, the court submitted to the jury an instruction and verdict forms for Count 4 that corrected the statute violated. (RT 540:1-541:3.)

fairness of the trial in any way. Although Petitioner complains that the court did not tell him what occurred when he was absent, the court stated he missed half of the pre-instructions and asked whether he had any questions, to which Petitioner responded "no." (RT 186:13-16, 187:21-22.)

As to Petitioner's ineffective assistance of counsel claims, Petitioner has not shown how an objection to the court's finding of voluntariness would have helped his case. Defense made three unsuccessful attempts to contact or look for Petitioner before the court resumed the trial. (RT 129:15-18, 130:5-11, 131:24-26, 140:6-9.) In addition, since any objections Petitioner or his counsel could have made to the instructions given while Petitioner may have been absent would have been meritless,[15] (*see infra* at 25-28), Petitioner has not shown that his presence or his counsel's informing him of what occurred in his absence would have helped his defense. Therefore, he was not prejudiced by any alleged deficiency of defense counsel. *Strickland*, 466 U.S. at 697.

## C.   GROUND FOUR: Erroneous Jury Instruction

Petitioner argues the trial court's preliminary instruction on circumstantial evidence denied him the presumption of innocence, lowered the prosecution's burden of proof, and failed to give the legal definition of the term "inference." (Am. Pet. at 33-34.) This claim fails.

Before opening statements, the trial court instructed the jury with a modified version of CALJIC No. 2.00 as follows:

> Any fact in this case may be proven by either direct or circumstantial evidence. Direct evidence means exactly what the name implies; that is, it is evidence that directly proves a fact without having to infer that fact from some other fact. Circumstantial evidence, on the other hand, is evidence which proves

---

[15]   Petitioner also objects to the preliminary instruction regarding circumstantial evidence given in his absence. (Am. Pet. at 28.) That instruction is addressed in Ground Four.

25

1  a fact from which you may infer the fact in question; for example, if the question of

2  fact in a given case is whether or not the defendant was swimming, testimony by a

3  witness that he or she saw the defendant jump into the swimming pool and swim

4  would be direct evidence of such fact.

5  However, if a witness testified that he or she arrived at the pool only to see

6  the defendant standing by the pool in a wet bathing suit with wet marks leading

7  from the pool to the defendant's feet, that would be circumstantial evidence of the

8  fact that the defendant was, in fact, swimming.

9  The law makes no distinction between direct and circumstantial evidence as

10  to the degree of proof required.  And facts may be proven by either type of

11  evidence or a combination of the two.  Each is accepted as a reasonable method

12  of proof and each is respected for such convincing force as it may carry.

13  (RT 145:3-46:8 (quotation marks omitted).)

14  A faulty jury instruction will constitute a violation of due process where the

15  instruction by itself so infected the entire trial that the resulting conviction violates due

16  process. *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991);

17  *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973).  The

18  instruction must be more than merely erroneous; rather, "the petitioner must establish

19  that there was a reasonable likelihood that the jury applied the instruction in a way that

20  violated a constitutional right." *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992)(en

21  banc), *cert. denied*, 507 U.S. 992 (1993); *McGuire*, 502 U.S. at 72.  Furthermore, "it is

22  well established that the instruction 'may not be judged in artificial isolation,' but must be

23  considered in the context of the instructions as a whole and the trial record." *Id.*;

24  *Middleton v. McNeil*, 541 U.S. 433, 437, 124 S. Ct. 1830, 158 L. Ed. 2d 701 (2004).

25  "[T]he Due Process Clause protects the accused against conviction except upon

26  proof beyond a reasonable doubt of every fact necessary to constitute the crime with

27  which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d

28  368 (1970); *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S. Ct. 1239, 127 L. Ed. 2d 583

(1994). "Jury instructions relieving States of this burden violate a defendant's due process rights." *Carella v. California*, 491 U.S. 263, 265, 109 S. Ct. 2419, 2420, 105 L. Ed. 2d 218 (1989) (per curiam); *United States v. Alferahin*, 433 F.3d 1148, 1157 (9th Cir. 2006).

Here, during jury selection, the trial court informed the prospective jurors of the presumption of innocence and the prosecution's burden of proof beyond a reasonable doubt (RT 26:26-27:18, 97:5-19), which were reiterated in a closing instruction. (CT 168.) Before giving the preliminary instruction, the trial court also noted to the jury: "I will also give you some further instructions after you have heard all the evidence that covers the additional law in which you are to follow both now and at the conclusion of the case." (RT 141:16-19.)

In its concluding instructions, the trial court instructed the jury with CALJIC No. 2.00, which stated, in relevant part:

> Evidence is either direct or circumstantial.
>
> Direct evidence is evidence that directly proves a fact, without the necessity of an inference. It is evidence which by itself, if found to be true, establishes that fact.
>
> Circumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn.
>
> ***An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence.*** It is not necessary that facts be proved by direct evidence. They may be proved also by circumstantial evidence or by a combination of direct evidence and circumstantial evidence. Both direct evidence and circumstantial evidence are acceptable as means of proof. Neither is entitled to any greater weight than the other.

(CT 151 (emphasis added).) In addition, the jury was given CALJIC No. 2.01, which provided:

However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

*Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt.* In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact of circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

Also, if the circumstantial evidence [as to any particular count] is susceptible of two reasonable interpretations, one of which points to defendant's guilt and the other to [his] innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to [his] guilt.

If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

(CT 152 (emphasis added).)

Given that the trial court's instructions correctly addressed presumption of innocence, prosecution's burden of proof, and legal definition of the term "inference," Petitioner has not demonstrated that a preliminary instruction so infected the entire trial that the resulting convictions violated due process. *McGuire*, 502 U.S. at 72; *Cupp*, 414 U.S. at 147.

### D.   GROUND FIVE: Delayed Disclosure of Rebuttal Witness

Petitioner argues the trial court erred in granting the prosecution's ex-parte request to delay the disclosure of rebuttal witness Howard Norman and Petitioner received ineffective assistance of counsel in connection with Norman's testimony. (Am. Pet. at 43-58.) These claims fail.

1  At the prosecutor's request, following the testimony of Larry Corn (a security guard
2  at the Savannah West Club on the night of Petitioner's arrest), an ex parte hearing
3  pursuant to Cal. Penal Code § 1054.7 was held between the prosecutor and the trial
4  court regarding a potential rebuttal witness, Howard Norman. (RT 291:21-27.) The
5  prosecutor explained that, based on Mr. Corn's testimony and the future testimony of
6  Mr. Hill and Petitioner, she was considering calling Mr. Norman as a rebuttal witness to
7  testify as to the practices and procedures of the valet parking service at the ABC
8  entertainment center.  She explained that Mr. Norman was not a percipient witness.
9  She would offer Mr. Norman's testimony only to impeach the testimony of Mr. Corn, Mr.
10  Hill and Petitioner, depending upon what they said at trial.  She requested an order
11  permitting the prosecution to wait until Mr. Hill and Petitioner testified before turning
12  over information to defense counsel.  (RT 292:3-293:5.)

13  The court granted the prosecution's request and ordered:  "In view of the fact that
14  Mr. Hill has not yet testified and [Petitioner] has not yet testified, that the People will not
15  be required to reveal the name of this prospective witness until they have ascertained
16  whether, in fact, they intend to call him. [¶] I will indicate once that decision is made
17  after those witnesses have testified, that the People will be required to apprise counsel
18  of the name and the supposed testimony of that particular witness."  (RT 293:16-26.)

19  During a break in Petitioner's cross-examination, the prosecutor provided defense
20  counsel with some of her notes from an interview with Norman.  (RT 375:20-23.)  After
21  completion of Petitioner's testimony, the prosecutor made an offer of proof that Norman
22  was "one of the managers at the valet parking service utilized by [Petitioner] and that he
23  will testify about the procedures and practices of this valet service and will directly
24  impeach the testimony of [Petitioner] and Archie Hill in a number of ways.  (RT 395:10-
25  15.)

26  Defense counsel objected that he had not received information about this witness
27  or what he was going to testify to, and that the prosecutor's failure to disclose the
28

29

1  information was a "violation of . . . [Penal Code section] 1054." Defense counsel asked

2  that the witness not be allowed to testify. (RT 395:17-396:6.)

3      The trial court denied defense counsel's request: "There was an ex parte hearing

4  reported, and the Court did make an order and ruling that [the prosecutor] could

5  withhold disclosure of that particular witness, since the witness was not percipient, until

6  [the prosecutor] had determined, based on the testimony of both Mr. Hill and

7  [Petitioner], as to whether that witness would be relevant. [¶] And based on the

8  representations and the offer of proof of [the prosecutor], the Court finds he is a proper

9  rebuttal witness since he's not a percipient witness.

10  (RT 396:20-28.)

11      **1.   Trial Court Error**

12      Petitioner contends the trial court exceeded its jurisdiction under Penal Code §§

13  1054-1054.7.[16] (Am. Pet. at 49.) This claim is not cognizable on federal habeas review.

14  *Pulley v. Harris*, 465 U.S. 37, 41, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984); *see also*

15  *McGuire*, 502 U.S. at 67 ("[I]t is not the province of a federal habeas corpus court to

16  reexamine state-court determinations on state-law questions. In conducting habeas

17  review, a federal court is limited to deciding whether a conviction violated the

18  Constitution, laws, or treaties of the United States."); *see also Weatherford v. Bursey*,

19

20  _____

21  [16] Cal. Penal Code § 1054.1(a) requires the prosecutor to disclose to the defense "[t]he

22  names and addresses of persons the prosecutor intends to call as witnesses at trial" if the
information is in the possession of the prosecutor.

23  Cal. Penal Code § 1054.7 provides, in pertinent part:
The disclosures required under this chapter shall be made at least 30 days prior to

24  the trial, unless good cause is shown why a disclosure should be denied, restricted,
or deferred. If the material and information becomes known to, or comes into the

25  possession of, a party within 30 days of trial, disclosure shall be made immediately,
unless good cause is shown why a disclosure should be denied, restricted, or

26  deferred. "Good cause" is limited to threats or possible danger to the safety of a
victim or witness, possible loss or destruction of evidence, or possible compromise

27  of other investigations by law enforcement.

28

1   429 U.S. 545, 560, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977) (no general constitutional right

2   to discovery in criminal case).

### 2.   Ineffective Assistance of Counsel

4   Petitioner argues his trial counsel was ineffective for failing to object to Norman's

5   testimony on the right grounds.  According to Petitioner, counsel should have objected

6   that (1) the court erred in allowing the prosecution to withhold Norman's name and

7   address under due process and statutory grounds, Cal. Penal Code § 1054, et seq.;

8   and (2) Norman's testimony was irrelevant and prejudicial.  In addition, counsel should

9   have requested a continuance and investigated the facts for an effective cross

10  examination.  Finally, appellate counsel was deficient for failing to raise these

11  arguments on appeal.  (Am. Pet. 51-58.)  Petitioner's claims fail.

12      Trial counsel did object to Norman's testimony on the basis of fairness and Cal.

13  Penal Code § 1054.  (RT 396:5-6.)  The trial court responded that it had previously

14  issued an order that the prosecution could withhold disclosure of Mr. Norman, and

15  further found that Mr. Norman was a proper rebuttal witness.  (RT 396:20-28.)  Thus,

16  Petitioner cannot establish a "reasonable probability that, but for counsel's

17  unprofessional errors, the result of the proceeding would have been different."

18  *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 391.

19      Trial counsel was not deficient in failing to object that Norman's testimony was

20  irrelevant and prejudicial.  Relevant evidence is "evidence, including evidence relevant

21  to the credibility of a witness . . . having any tendency in reason to prove or disprove

22  any disputed fact that is of consequence to the determination of the action."  Cal. Evid.

23  Code § 210.  "This definition of relevant evidence is manifestly broad.  Evidence is

24  relevant when no matter how weak it is it tends to prove a disputed fact."  *In re Romeo*

25  *C.*, 33 Cal. App. 4th 1838, 1843, 40 Cal. Rptr. 2d 85 (1995).  Under Cal. Evidence Code

26

27

28

§ 352,[17] prejudicial evidence is evidence that uniquely tends to evoke an emotional bias against a party as an individual and which has only "slight probative value" with regard to the issues. *People v. Samuels*, 36 Cal. 4th 96, 124, 30 Cal. Rptr. 3d 105 (2005), *cert. denied*, 547 U.S. 1073 (2006).

In claiming that Norman's testimony was irrelevant, Petitioner argues the prosecution failed to establish that Norman's company provided services for individuals going to Savannah West Night Club. (Am. Pet. at 55.) There was sufficient evidence from which the jury could infer that it did. Petitioner testified that the Savannah West Club is located "on the Avenue of the Stars where the Shubert theater" is located (RT 370:15-18), and Hill testified that the club was located in Century City (RT 303:4-7). Norman testified his company operated valet parking services "for the complex that is in Century City on Avenue of the Stars where the Shubert Theater and the ABC complex are located," and that, to his knowledge, no other valet parking service operated within that structure. (RT 439:26-440:17, 446:24-448:1.) Norman's testimony was therefore relevant. Cal. Evid. Code § 210. Petitioner has provided no support for his argument that the evidence was prejudicial and the Court can discern none. *James*, 24 F.3d at 26; *Jones*, 66 F.3d at 205.

Petitioner argues that trial counsel was deficient in failing to ask for a continuance to investigate the facts and prepare an effective cross-examination of Norman. Norman, the assistant Vice President of Operations for Valet Parking Service (RT 439:9-11) testified that his company handled the valet parking for the ABC Entertainment Center. (RT 446:24-447:15.) An individual using the valet parking would be issued the claim portion of a parking ticket before an attendant parked the car, locked the doors, attached the keys to the key stub portion of the ticket, and placed it

---

[17] Evidence Code § 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

inside a metal lock key box, which is located inside a parking booth.  (RT 441:12-24.)

When asked, "[I]f someone just wants to hand one of the parking attendants a tip and not get a claim check, is that allowed?" Norman responded, "That is not allowed."  (RT 442:9-12.)

According to Petitioner, trial counsel could have established that some people were permitted to keep their keys when using the valet parking services at the Savannah West Night Club.  (Am. Pet. 56.)  Trial counsel did, however, establish on cross-examination that Norman was not a percipient witness and could not testify as to what actually occurred on May 22, 1997, the night in question.  (RT 448:2-6.)  Counsel did call other witnesses that testified certain people were permitted to keep their keys after giving substantial tips to the attendant notwithstanding company policies and procedures (RT 462:3-8, 462:23-463:5 (Corn), RT 352:26-27, 370:4-371:16 (Petitioner).  Petitioner cannot establish there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 391; *see Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir.) ("[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."), *cert. denied*, 525 U.S. 839 (1998).

Because Petitioner's claims have no merit, appellate counsel's decision not to raise them on direct appeal cannot have been deficient.  The *Strickland* test also applies to claims of ineffective assistance by appellate counsel.  *See Smith*, 528 U.S. at 285-86 ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*").  The test for deficient performance is the same as for trial counsel.  *Id.* at 285 (petitioner "must first show that his counsel was objectively unreasonable").  To establish prejudice, a petitioner "must show a reasonable probability that, but for his counsel's [error], he would have prevailed on his appeal."  *Id.* (citation omitted).  Appointed appellate counsel is not required "to press nonfrivolous points requested by the client, if counsel, as a matter of professional

judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983).

### E.    GROUND SIX: CALJIC No. 12.02

Petitioner argues the trial court's use of CALJIC No. 12.02 allowed the jury to find him guilty of counts 1 and 4 by relying on facts found only by a preponderance of the evidence. (Am. Pet. at 61.)

CALJIC No. 12.02 reads:

Defendant is accused in Count 4 of having violated Section 11379.5 of the Health and Safety Code, a crime.

Every person who transports phencyclidine, a controlled substance, is guilty of a violation of Health and Safety Code Section 11379.5, a crime.

In order to prove this crime, each of the following elements must be proved:

1.    A person transported phencyclidine, a controlled substance; and

2.    That person knew of its presence and nature as a controlled substance.

(CT 173.)

Petitioner's claim must be rejected because he has failed to explain how this instruction lowered the prosecution's burden of proof. *James*, 24 F.3d at 26; *Jones*, 66 F.3d at 205. In addition, the jury received CALJIC No. 2.90, which informed it that the prosecution has the burden of proving guilt beyond a reasonable doubt (CT 168) and was instructed that it must "[c]onsider the instructions as a whole and each in light of all the others." (CT 147.)  Therefore, no constitutional violation occurred.

### F.    GROUND SEVEN: Testimony Regarding the Horizontal Gaze Nystagmus Test

Petitioner argues that, as to Counts 1, 3 and 4, the trial court erred in allowing a police officer to use findings from Horizontal Gaze Nystagmus testing as a basis for an opinion that Petitioner was driving under the influence of PCP.  Petitioner further argues he received ineffective assistance of counsel on this issue. (Am. Pet. 62-75.)  Neither claim has merit.

34

The trial court ruled that Officer Reynosa would not be permitted to offer an opinion as to the results of the nystagmus test. (RT 228:10-16.) Sergeant Reynosa subsequently testified on direct examination that, in his opinion, Petitioner was under the influence of PCP based on his observable symptoms – "The slow and deliberate movements, the inability to maintain his balance, the blank stare, lethargic speech and the bouncing of the eyeballs, basically, when I placed my finger in front of his eyes and asked him to follow and track my finger." (RT 236:25-237:13.)

In his defense, Petitioner called Kenneth Parker, as a forensic expert. (RT 399:20-23.) The prosecutor stipulated that Parker was an expert toxicologist. (RT 402:13-18.) On direct examination, Parker testified he did not agree with the statement that difficulty looking in one direction is associated specifically with PCP intoxication, and agreed that PCP and alcohol intoxication symptoms are almost identical. (RT 403.)

On cross-examination, Parker denied there would be anything unusual about the eyes of an individual under the influence of PCP. (RT 419:20-420:4.) At a sidebar conference, the prosecutor claimed that when she interviewed Parker the day before, the "first thing he told [her was] that you can recognize someone under the influence of PCP because they have horizontal and vertical nystagmus." (RT 421:1-8.) She believed the witness was not being forthcoming, and wanted to "inquire whether or not nystagmus or vertical and horizontal gaze nystagmus is something that is indicative of PCP use." (RT 421:13-18.) The court permitted the inquiry. (RT 421:22-422:18.) The prosecutor then continued her cross-examination of Parker, in relevant part, as follows:

> Q[:] Isn't it true that horizontal and vertical gaze nystagmus are indicators of someone being under the influence of drugs and/or alcohol?  Yes or no?  A[:] Yes
>
> Q[:] Isn't it true that someone under the influence of phencyclidine would exhibit vertical and horizontal gaze nystagmus?
>
> A[:] No.  They may exhibit it.
>
> Q[:] And isn't it true that that would be one indicator for a police officer to look for? Yes or no?

A[:] It may be because many persons have horizontal and/or vertical gaze nystagmus who never had anything to drink or any PCP. It's normal and natural in many persons. [¶] Others who are tired, develop a positive test in that regard. So it has to be used with a great deal of caution, if at all– . . .

Q[:] And in your experience, have you ever heard of police officers–just have you heard of it, yes or no–police officers looking fo such indicators to determine if someone's under the influence of a drug?

A[:] Yes.

Q[:] And would you agree, Sir, that it would be one thing that you yourself might look for if you were trying to determine if someone was under the influence of PCP?

A[:] No, I find it a test which is not useful for sorting out those who do have drug use or alcohol use from those who have not.

Q[:] But you do agree, Sir, that it is one symptom associated with someone under the influence of PCP?

A[:] Yes, it's barely usable, if at all.

(RT 424:18-26:1.)

In rebuttal, Officer Azran testified that he and Sergeant Reynosa conducted a horizontal gaze nystagmus test on Petitioner and observed his eyeballs bouncing vertically and horizontally.  (RT 436:3-17.)

### 1.    Admission of Evidence

Petitioner argues that nystagmus testing is "not generally [ac]cepted in the relevant scientific community as reliable in determining if someone is under the influence of PCP as oppose[d] to alcohol." (Am. Pet. at 62.)  Assuming it is, Petitioner contends Sergeant Carlos Reynosa was "not qualified to differentiate between alcohol intoxication, and someone being under the influence of PCP based on the results of the test." (*Id.* at 62, 70.)

Whether evidence was "incorrectly admitted . . . pursuant to California law . .

36

. is no part of a federal court's habeas review of a state conviction." *McGuire*, 502 U.S. at 67 (internal quotation marks omitted) (first ellipses in original).[18]  The only issue is whether the admission violated Petitioner's "federal constitutional rights." *Id.* at 68; *see also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). Thus, the key question is whether the admission of evidence was so arbitrary or so unduly prejudicial as to render a defendant's trial fundamentally unfair. *McGuire*, 502 U.S. at 67; *Jammal*, 926 F.2d at 920.  Further, "[o]nly if there are *no* permissible inferences the jury may draw from evidence can its admission violate due process." *Id.*

Petitioner has not shown that there are no permissible inferences the jury could draw from the admission of the evidence relating to the police officer's observations of Petitioner during the nystagmus testing.  The defense's own expert witness acknowledged that someone under the influence of PCP may exhibit horizontal and vertical nystagmus.[19]  (RT 424:18-426:1.)  The trial court did not err in allowing the police officers to testify as to what they observed about Petitioner's symptoms.  (RT 422:16-18, 436:3-17.)

---

[18]   Petitioner's argument that the trial court erred under *Kelly-Frye* is not a cognizable claim under federal habeas review.  (Am. Pet. at 70); *see Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1999) ("We have no authority to review alleged violations of a state's evidentiary rules in a federal habeas proceeding.") (citation omitted), *cert. denied sub. nom. Windham v. Runnels*, 541 U.S. 950 (2004).

[19]   California courts have cited nystagmus testing in assessing whether  defendant was under the influence of PCP.  *See, e.g., People v. Bonillas*, 48 Cal. 3d 757, 782, 257 Cal. Rptr. 895 (1989) ("Dr. Berman thought he detected nystagmus–movement of the eyes characteristic of PCP intoxication–at two points on the videotape [of the defendant's reenactment of the crime].”), *cert. denied*, 493 U.S. 922 (1989); *People v. Diaz*, 212 Cal. App. 3d 745, 747-48, 260 Cal. Rptr. 806 (1989) (defendant exhibited various symptoms of PCP intoxication, including horizontal and vertical nystagmus); *People v. Abes*, 174 Cal. App. 3d 796, 801 n.1, 220 Cal. Rptr. 277 (1985) (according to a police officer, the symptoms of being under the influence of PCP include vertical and horizontal nystagmus); *People v. Olivas*, 172 Cal. App. 3d 984, 986, 218 Cal. Rptr. 567 (1985) (defendant's "eyes exhibited horizontal and vertical nystagmus (a jerky eye movement), which is indicative of PCP use").

## 2. Ineffective Assistance of Counsel

Petitioner argues that trial counsel was deficient for failing to object to the police officers' testimony on *Kelly-Frye* grounds. In addition, Petitioner argues trial counsel should have sought a stipulation from the prosecution that factors other than PCP may cause horizontal or vertical nystagmus. (Am. Pet. at 74-75.)

Given that the trial court did not err in admitting the officers' testimony as to their observations of Petitioner's symptoms, counsel cannot have been deficient in failing to object. *See Borg*, 24 F.3d at 27 ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel."). Petitioner's argument that trial counsel should have sought a stipulation from the prosecution is entirely speculative. The prosecutor did not suggest that only PCP causes nystagmus. (*E.g.*, RT 424:18-20.) Petitioner cannot establish any deficiency. Moreover, there is no reasonable probability that the result would have been different. *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 391.

## G.    GROUND EIGHT: Addition of Count 4

Petitioner claims the addition of Count 4 violated his right to notice of the charges against him and counsel was ineffective in connection with the addition of this count. (Am. Pet. at 76-79.) These claims fail.

On April 20, 1998, prior to jury selection, the prosecutor submitted an Amended Information adding Count 4 for "sale/transportation/offer to sell" PCP. (RT 29A; CT 37-40.) Defense counsel objected to it "being added on the last day." (RT 29A:11-12.) The prosecutor explained that the reason for adding Count 4 stemmed from interviews of defense witnesses. (RT 29A:14-18.) The court examined the preliminary hearing transcript and issued its ruling:[20]

---

[20] Under Cal. Penal Code § 1009, an information cannot be amended "so as to charge an offense not shown by the evidence taken at the preliminary examination." During the preliminary hearing on July 18, 1997, Officer Reynosa testified that he and Officer Azran brought Petitioner's vehicle to a stop. (CT 5.) Officer Azran then recovered cigarettes from

1　THE COURT: I have taken a look at the relevant portions of the preliminary

2　hearing transcript. This arrest did arise out of a traffic stop. It doesn't really

3　change the gravamen of the defense at all. You are still going to have to

4　show knowledge and show control. The elements are not that different. [¶]

5　I, frankly, agree with counsel. It should be filed a lot sooner, but it doesn't

6　really change the essence of the charge or the case. I will allow the

7　amendment.

8　(RT 30A:5-12.)

9　　"A person's right to reasonable notice of a charge against him, and an

10　opportunity to be heard in his defense – a right to his day in court – are basic in

11　our system of jurisprudence." *In re Oliver*, 333 U.S. 257, 273, 68 S. Ct. 499, 92 L.

12　Ed. 682 (1948). This guarantee is applicable to the states through the due

13　process clause of the Fourteenth Amendment. *Cole v. Arkansas*, 333 U.S. 196,

14　201, 68 S. Ct. 514, 92 L. Ed. 644 (1948).

15　　To show that a delay in adding a count to a charging document violated due

16　process, "(1) the defendant must prove actual, non-speculative prejudice from the

17　delay; and (2) the length of the delay, when balanced against the reason for the

18　delay, must offend those fundamental conceptions of justice which lie at the base

19　of our civil and political institutions." *United States v. Talbot*, 51 F.3d 183, 185-86

20　(9th Cir. 1995); *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992). In

21　demonstrating actual prejudice, the defendant's burden is a heavy one: the proof

22　must be definite and not speculative, and the defendant must demonstrate how

23　the loss of a witness and/or evidence is prejudicial to his case. *Talbot*, 51 F.3d at

24　186 (citations omitted).

25　　Petitioner argues that the addition of Count 4 changed the gravamen of the

26　charges against him because the transportation charge disqualified him from

27

28　the driver's floor board that had a smell consistent with PCP. (*Id.* at 9-10.)

39

consideration for deferred entry of judgment. (Am. Pet. at 77.) As discussed in connection with Ground Two, Petitioner was ineligible for deferred entry of judgment even without Count 4. *See supra* at 15. The trial court reviewed the preliminary hearing transcript and correctly noted that Count 4 arose out of the same set of facts and its addition did not change the fact that Petitioner would still need to show a lack of control and knowledge to be acquitted on all counts. (RT 30A:5-12.) Petitioner has not shown actual, non-speculative prejudice from delay. Therefore, no due process violation occurred. *See Talbot*, 51 F.3d at 186 (it is unnecessary to reach the balancing portion of the test if the defendant has not made a sufficient showing of prejudice).

Petitioner's claim of ineffective assistance of counsel for failing take "the steps necessary to avoid assisting the prosecutor in her efforts to amend the information to include transportation which may have included a strategic decision not to call witnesses that may provide information that will implicate [P]etitioner in additional crimes." (Am. Pet. at 78.) This claim must be rejected as conclusory given that Petitioner has not identified the witnesses to which he is referring. *James*, 24 F.3d at 26; *Jones*, 66 F.3d at 205. Even assuming the witnesses are Hill and Corn, there is no reasonable probability that the result would have been different without their testimonies.[21] *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 391.

The California Court of Appeal's denial of Ground Eight was neither contrary to, nor an unreasonable application of, clearly established federal law.

---

[21]   Given that (1) Petitioner was ineligible for the deferred entry of judgment program regardless of Count 4, (2) amendment of the information did not result in a constitutional deprivation of notice, and (3) there was evidence of transportation of PCP in the preliminary hearing transcript, Petitioner cannot establish ineffective assistance of counsel for failing to make those arguments. *Strickland*, 466 U.S. at 694.

### H.    GROUND NINE: Aiding and Abetting Instruction

Petitioner argues the trial court violated his constitutional rights by instructing the jury with CALJIC No. 3.01 on aiding and abetting.[22]  (Am. Pet. at 80.)

The prosecutor requested that CALJIC 3.01 be given, explaining:

> It's not our primary theory.  Aiding and abetting is being offered because we believe that the evidence does support that theory.  Under one version presented by the defense if–the most concise way to express this is, the defendant's guilty of transportation on a number of different theories.  [¶]  One of them is the fact that Archie Hill drove [Petitioner's] car from the club to another location, and in the process, transported the PCP.  [Petitioner] was not driving, according to the defense testimony at that time.  So our position is that [Petitioner] on that–if the jury believes that portion, he's still guilty of transportation because he aided and abetted Archie Hill's transporting of the drugs.  It was his car–

(RT 468:18-69:4.)  Defense counsel argued that an aiding and abetting instruction is "inappropriate for the crimes that are charged and the circumstances and the evidence."  (RT 469:8-10.)  The trial court disagreed:

---

[22]  CALJIC No. 3.01 reads:
  A person aids and abets the [commission] of a crime when he or she,
  (1)    with knowledge of the unlawful purpose of the perpetrator and
  (2)    with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and
  (3)    by act or advice aids, promotes, encourages or instigates the commission of the crime.
  [A person who aids and abets the [commission] of a crime need not be present at the scene of the crime.]
  [Mere presence at the scene of the crime which does not itself assist the commission of the crime does not amount to aiding and abetting.]
  [Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.]
(CT 169.)

I think the People legitimately have an argument.  How strong that argument is, is another question.  But I think they're entitled to an instruction at least to advise the jury if the jury were to accept that particular interpretation of the evidence.  So I will give that instruction as it relates to count 4 only.

(RT 469:11-16.)  In closing argument as to Count 4, the prosecutor argued:

Count 4 is transportation of phencyclidine.  Very simple.  Did [Petitioner] transport PCP, meaning was it in his car?  Was the car moving?  Did the car go from A to B? [¶] Well, that happened a number of times.  The evidence has shown that [Petitioner] picked up Archie Hill.  Even if we believe that Archie Hill brought the cigarettes and put them in the car, if [Petitioner] knew that Archie Hill had that PCP and he transported him from point A, Archie Hill's home, to point B, the Savannah West Club, he's guilty of transportation right there. . . .  [¶] Second, when [Petitioner] allowed Archie Hill–even if we believe his story that Archie Hill drove home, it's still transportation if he knew that the PCP was in that car, anywhere in that car.  He transported it from point A, Savannah West to point B, guilty of transportation.  [¶] Number 3 the officers stopped [Petitioner] alone, driving the car with the PCP right in front of him. . . .

(RT 479:24-80:22.)

Petitioner fails to show that the jury instruction so infected the entire trial that the resulting conviction violates due process.  *Estelle*, 502 U.S. at 72; *Cupp*, 414 U.S. at 147.  Petitioner first argues that the evidence was insufficient to support an aiding and abetting instruction.[23]  (Am. Pet. at 81.)  He contends that the only

---

[23]  In California, "[i]t is error to instruct a jury on a theory of guilt without evidentiary support, but the trial court must instruct the jury on every theory that is supported by substantial evidence." *People v. Jantz*, 137 Cal. App. 4th 1283, 1290, 40 Cal. Rptr. 3d 875 (2006) (citations omitted). "Substantial evidence is evidence that would allow a reasonable jury to find the existence of the facts underlying the instruction. and to find the defendant guilty beyond a reasonable doubt based on the theory of guilt set forth in the instruction.

evidence that supported the instruction was that Hill drove Petitioner's car, and in the process transported the PCP. However, there was also evidence that Petitioner not only allowed Hill to drive his car (RT 314:11-28), but had been informed by Hill and Corn, who was a security guard at the Savannah West Club on the night in question (RT 257:28-258:20), that Hill had to leave the club because he had drugs with him. (RT 306:6-13, 307:2-19, 312:1-12.)  Petitioner also admitted that he was familiar with the odor associated with PCP, and therefore could have inferred that the drugs were PCP. (RT 369:16-370:3.) Therefore, there was "substantial evidence" that Petitioner knew of Hill's criminal purpose of transporting his PCP cigarettes. See People v. Swanson-Birabent, 114 Cal. App. 4th 733, 740, 7 Cal. Rptr. 3d 744 (2003).

Petitioner next argues that, because the trial court did not give an instruction informing the jury that CALJIC No. 3.01 was limited to Count 4, the jury could have believed that it could convict Petitioner under Count 1 based on an aiding and abetting theory. (Am. Pet. at 82-83.) However, a jury instruction must be viewed in the context of the instructions as a whole and the trial record. McGuire, 502 U.S. at 72. The prosecution's closing argument relied on this theory only with respect to Count 4. (RT 479:24-80:22.) The court instructed the jury:

> The purpose of the court's instructions is to provide you with the applicable law so that you may arrive at a just and lawful verdict. Whether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist. . . .

(CT 180.)

---

In making this determination, [California Courts of Appeal] review the evidence most favorably to the judgment presuming the existence of every fact that reasonably may be deduced from the record in support of the judgment. There is no instructional error when the record contains substantial evidence in support of a guilty verdict on the basis of the challenged theory." Id.

Lastly, Petitioner argues the jury could have understood CALJIC No. 3.30[24] to mean that it could convict him based on an aiding and abetting theory even if he "did not have the requisite intent to aid and abet"; in other words, even if there was no concurrence of act and intent. (Am. Pet. at 83-84.) This argument has no merit because CALJIC No. 3.01 specifically told the jury that aiding and abetting liability was based on both an act and a mental component.

In short, Petitioner has not shown that CALJIC No. 3.01 or 3.30 so infected the entire trial that the resulting conviction violates due process. *Estelle*, 502 U.S. at 72; *Cupp*, 414 U.S. at 147. Accordingly, counsel's alleged failures to object to the instructions on these grounds also fails under *Strickland*.

## I.   GROUND TEN: Voluntary Intoxication Instruction

Petitioner argues counsel was ineffective for failing to request an instruction on voluntary intoxication, which would have apprised the jury that "it should consider [P]etitioner's state of intoxication in determining if [P]etitioner was

---

[24] CALJIC No. 3.30 reads:

> In the crimes charged there must exist a union or joint operation of act or conduct and general criminal intent. General intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, [he] is acting with general criminal intent, even though he may not know that his act or conduct is unlawful.

(CT 170.)

capable of forming . . . the specific intent required . . . as an aider and [abettor]."[25] (Am. Pet. at 92.)  This claim also fails.

In California, "[e]vidence of voluntary intoxication is admissible . . . on the issue of whether or not the defendant actually formed a required specific intent." Cal. Penal Code § 22(b).  To be convicted of a substantive offense, an aider and abettor must "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." *People v. Mendoza*, 18 Cal. 4th 1114, 1123, 77 Cal. Rptr. 2d 428 (1998) (emphasis in original) (citation omitted).  In *Mendoza*, a case decided after Petitioner's trial, the California Supreme Court reasoned that the intent requirement for aiding and abetting liability is a "required specific intent" for purposes of Cal. Penal Code § 22(b), and since the required mental state cannot

---

[25]  CALJIC No. 4.21.1 ("Voluntary Intoxication–Trial With General and Specific Intent Crimes"), provides:

It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition.

Thus, in the crime[s] of ___ charged in Count[s] ___ , [or the crime of ___ which is lesser thereto,] the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve defendant of responsibility for the crime.  This rule applies in this case only to the crime[s] of ___[.] [, and the lesser crime[s] of ___.]

However, there is an exception to this general rule, namely, where a [specific intent] [or] [mental state] is an essential element of a crime.  In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required [specific intent] [or] [mental state] at the time of the commission of the alleged crime.

Thus, in the crime[s] of ___ , ___ , ___ , charged in Count[s] ___ , [or the lesser crime[s] of ___,] a necessary element is the existence in the mind of the defendant of [a] certain [specific intent[s]] [or] [mental state[s]] which is included in the definition of the crime[s] set forth elsewhere in these instructions.

If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not [that] defendant had the required [specific intent] [or] [mental state].

If from all the evidence you have a reasonable doubt whether a defendant had the required [specific intent] [or] [mental state], you must find that defendant did not have that [specific intent] [or] [mental state].

be mechanically divided into knowledge and intent, the jury may consider intoxication on both the defendant's knowledge and intent in determining whether the defendant is liable as an aider and abettor. *Mendoza*, 18 Cal. 4th at 1131. However, the Court also explained:

> Although evidence of intoxication is admissible on the question of aider abettor liability, a jury can still find an intoxicated person guilty as an aider and abettor. Evidence of intoxication, while legally relevant, may be factually unconvincing. [A]s with any evidence, the jury may give this testimony whatever weight it deems appropriate in light of the evidence as a whole.

*Id.* at 1133-34 (citations and internal quotation marks omitted). Further, a court is not required to instruct on intoxication. *Id.* at 1134.

Petitioner cannot demonstrate that he was prejudiced by his counsel's failure to request an intoxication instruction. *Strickland*, 466 U.S. at 687. During direct examination, Petitioner testified that he was intoxicated on the night of his arrest and his thoughts were "vague as to what happened that night." (RT 355:21-358:23.) The defense argued the intoxication evidence to the jury. For example, in closing argument, defense counsel argued, "Is there an explanation that [Petitioner] did not see the cigarettes and he wasn't paying attention because he was under the influence of alcohol? Clearly," and emphasized that Petitioner was very inebriated. (RT 490:8-491:17.) The evidence was simply unconvincing to the jury. Petitioner has not shown there is a reasonable probability a voluntary intoxication instruction would have led to a different result under any Count. *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 391.

**J.    GROUND ELEVEN: Eliciting False Testimony**

Petitioner claims the prosecutor committed misconduct by using false testimony to gain a conviction and by falsely suggesting that Hill had nothing to

lose by testifying the PCP was his, and not Petitioner's. (Am. Pet. at 94-105.)
This claim fails.

During cross-examination, Hill testified:

Q[:] Now, Sir, you've never been arrested for drugs before; is that correct?

A[:] No.

Q[:] You've never been convicted of any sort of criminal offense; is that
correct?

A[:] No.

Q[:] And aren't you aware, Sir, that if you were prosecuted for possession of
drugs, that you would be eligible for a diversion program?

A[:] Yes. . . . [M]y attorney here . . . [¶] . . . informed me of that. . . .[26]

Q[:] And you're also aware that if you did get prosecuted for this crime, if you
completed the diversion of the drug treatment program, the case would be
entirely dismissed.  You're aware of that, aren't you, Sir?

A[:] Yes.

Q[:] And you're aware that based on your particular circumstances, you
wouldn't have a conviction at all for testifying? . . .

A[:] Yes.

(RT 323:8-324:7.)  In closing argument, the prosecutor argued Hill was not a
credible witness in part because he had "nothing to lose by testifying . . . .  He
admitted himself.  Nothing's going to happen to him."  (RT 483:24-484:3.)

Deliberate deception of the court and the jury is "inconsistent with the
rudimentary demands of justice."  *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.
Ct. 340, 79 L.  Ed. 791 (1935) (per curiam); *Hayes v. Brown*, 399 F.3d 972, 978
(9th Cir. 2005) (en banc).  Therefore, "a conviction obtained through the use of

---

[26] An attorney had been appointed to consult with Hill regarding his proposed testimony.
(RT 281-282.)

false evidence, known to be such by the representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. People of State of Ill.*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) (citations omitted); *United States v. LaPage*, 231 F.3d 488, 491-92 (9th Cir. 2000). "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *Hayes*, 399 F.3d at 978 (citations omitted). Furthermore, "[w]hen a prosecutor suspects perjury, the prosecutor must at least investigate." *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 957 (2007).

"To prevail on a claim based on *Mooney-Napue*," a habeas petitioner "must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003), *cert. denied*, 540 U.S. 1208 (2004); *Hayes*, 399 F.3d at 984. Evidence is material under *Napue* if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes*, 399 F.3d at 984 (citations omitted).

Petitioner argues the testimony was false because Hill did not qualify for deferred entry of judgment, since transportation of PCP is a disqualifying offense under the program. (Am. Pet. at 94.) However, the prosecution's question to Hill was predicated on a hypothetical prosecution "for possession of drugs," which is a qualifying offense. (RT 323:14-16.) The question did not elicit false testimony and was consistent with what Hill's attorney had already advised Hill. (RT 323:17-23.) Therefore, defense counsel could not have been deficient for failing to object to the testimony. *Strickland*, 466 U.S. at 687-88. Even assuming Petitioner's argument that the prosecution could have charged Hill with a disqualifying offense, the testimony was not material. As the prosecutor argued, even if Hill were

48

believed, "the only issue is [Petitioner's] knowledge." (RT 498:8-14.) Assuming Hill was truthful when he testified that the PCP cigarettes were his and he did not tell Petitioner about them, there was strong evidence that Petitioner knew of the cigarettes' presence in his car given that they were close to his feet and he was familiar with PCP, including its odor. Therefore, there is no reasonable likelihood that the testimony relating to Hill's eligibility for deferred entry of judgment affected the judgment of the jury. *Hayes*, 399 F.3d at 984.

### K.   GROUND TWELVE: Initial Sentencing Hearing

Petitioner argues that defense counsel rendered ineffective assistance at the initial sentencing hearing by failing to investigate the proposed testimony of Officer Mourot and the mitigating character letters, indicating that the defense would pay for Officer Mourot's expenses to return to Los Angeles for cross-examination, and failing to inform Petitioner that he had the right to compulsory process to obtain testimony of out-of-state witnesses. (Am. Pet. at 106-19.) In a related claim under Ground Thirteen, Petitioner claims that the trial court's ruling requiring Petitioner to pay Officer Mourot's expenses denied Petitioner's right to present a defense. (Am. Pet. at 154-161.) These claims fail.

The initial sentencing hearing was continued to June 17, 1998 on defense counsel's motion. (CT 218-223.) On June 1, 1998, the prosecutor filed a "Sentencing Memorandum; Response to Defense Motion to Strike Prior Convictions."[27] (CT 224-229.) In it, the prosecutor argued that Petitioner's motion to strike his prior convictions should be denied because Petitioner has "not alter[ed] his lifestyle of drugs and guns" and "presents a danger to society." (CT 229.) The conclusion was based in part on "recently obtained information"– Petitioner's May 26, 1998 federal grand jury indictment in the United States

---

[27] Petitioner filed a motion to dismiss his prior strikes on June 8, 1998. (CT 230-242.)

1   District Court for the Eastern District of Arkansas. (CT 225, 228.)  The indictment

2   charged Petitioner and approximately fifty associates with conspiracy to distribute

3   cocaine, cocaine base, marijuana and PCP. (CT 228.)  The indictment referred to

4   Petitioner as "the leader of the organization." (*Id.*)  The prosecution indicated that

5   it expected a representative from the United States Attorney's Office or the

6   Federal Bureau of Investigations to present evidence on the date of sentencing

7   regarding the federal indictment. (CT 226.)

8           On June 16, 1998, defense counsel filed another continuance motion, on

9   the grounds that Petitioner was "seeking a new attorney for advice as to his

10  sentencing hearing" and was in the process of obtaining money to pay his legal

11  fees. (CT 257-261.)  The prosecutor filed an opposition to the continuance

12  motion, arguing that it was untimely and that no good cause existed. (CT 263-

13  266.)  The prosecutor stated:

14          The [motion] was not received by the assigned deputy district attorney until

15          2:55 p.m. on June 16, 1998–the afternoon before the [sentencing] hearing. .

16          . . The People's witness for the sentencing was already en route, flying from

17          Little Rock, Arkansas, <u>before</u> the motion was faxed to the Beverly Hills office

18          of the Los Angeles County District Attorney's Office.

19  (CT 264 (emphasis in original).)

20          At the hearing on June 17, 1998, the prosecutor indicated that Officer

21  Robert Mourot of the Little Rock Police Department, who was "associated with the

22  FBI investigation concerning" Petitioner, had flown in from Arkansas. (RT 663:19-

23  23.)  Defense counsel objected and stated that the morning of the hearing was the

24  first time he found out about Officer Mourot's proposed testimony.  He asked to

25  have the information that would allow the defense to prepare for the officer's

26  testimony. (RT 663:27-664:5.)

27          The trial court then stated that its inclination was to allow the witness to

28  testify. (RT 665:6-11.)  The prosecution then called Officer Mourot as a witness,

1   who testified that, in addition to being a police officer in Little Rock, Arkansas, he

2   was currently assigned to an FBI violent crimes task force. (RT 669:19-21.) The

3   task force had been conducting an investigation of Petitioner and his associates

4   since January 1997. (RT 669:22-670:20.) Petitioner was being accused in the

5   federal indictment of a multi-state distribution of crack cocaine, marijuana, and

6   PCP, and firearms violation. (RT 671:4-11.) Officer Mourot testified that he had

7   been provided copies of eight letters that had been submitted to the Los Angeles

8   Superior Court and participated in investigations regarding such letters. (RT

9   672:7-18; CT 303-13.) He believed at least three of the individuals who wrote the

10  letters were indicted by the federal grand jury that indicted Petitioner.[28] (RT

11  672:19-22.) Officer Mourot then gave testimony regarding the lack of verifiable

12  addresses for Petitioner's alleged businesses. (RT 677:11-678:25.)

13

---

14  [28]   In addition, a letter from Ray Gillespie, athletic director of the Little Rock School
15  District, indicated he had known Petitioner for several years, had rented a house to
    Petitioner, and that Petitioner owned a gas station in Little Rock. (RT 672:27-673:10.) He
16  had not seen Petitioner since September 1996. (RT 673:19-20.) Gillespie told Officer
17  Mourot that he received a call from a woman who claimed to be Petitioner's girlfriend and
    asked for a reference letter for a job for Petitioner. (RT 673:11-16.) Gillespie assumed he
18  was writing a reference letter for Petitioner's landscaping business. (RT 673:17-19.)
          Lucretia Williams told Officer Mourot that she was once a roommate of Sharon
19  Wrobleski, who was also indicted along with Petitioner. (RT 673:23-674:1.) Williams was
20  asked to write a letter to the judge, and she handwrote a letter. When Williams was shown
    a copy of the typewritten letter that Officer Mourot had, she said that she did not type her
21  letter and that the signature on it was not hers, but some of the comments in the letter were
22  hers. (RT 674:6-19.)
          Horace Greene, Sr., a captain with the Little Rock Fire Department, said he had
23  been life-long friends with Petitioner's mother. Petitioner's mother told Green that her son
    was in trouble in California and asked Green to write a letter for him. Green indicated that
24  he wrote the letter because of his relationship with Petitioner's mother and he would not
25  have written the letter if he had known of Petitioner's prior convictions. (RT 674:21-
    675:20.)
26        Another letter was from Paula Simms, who had known Petitioner for five years "but
27  never really talked to him." She knew Petitioner's mother because she got her hair done
    at Simms' shop and had used Petitioner's landscaping business on one occasion. (RT
28  676:11-22.)

Officer Mourot testified that, on May 28, 1998, after Petitioner's indictment, a raid was conducted on the house which was rented to Petitioner. Numerous weapons, ammunition, a couple of scales, two bulletproof vests, and paperwork were seized from this residence. (RT 679:3-681:1.) At the time of the raid, there was one occupant in the residence, Petitioner's uncle Norman Miller, who was also indicted. None of the documentation pertaining to the residence was in Petitioner's name. (RT 681:8-25.)

Defense counsel requested a minimum two-week continuance to allow Petitioner to obtain new counsel and prepare for a rebuttal. (RT 683:1-11.) The prosecutor argued that the motion for continuance was untimely and that the defense should pay for the expense of bringing Officer Mourot back to testify.[29] (RT 683:14-684:1.)

---

[29] Cal. Penal Code § 1050(b) provides, in relevant part, that "[t]o continue any hearing in a criminal proceeding, . . . (1) a written notice shall be filed and served on all parties to the proceeding at least two court days before the hearing sought to be continued, together with affidavits or declarations detailing specific facts showing that a continuance is necessary . . ."

Penal Code § 1050(c) provides:

Notwithstanding subdivision (b), a party may make a motion for continuance without complying with the requirements of that subdivision. However, unless the moving party shows good cause for the failure to comply with those requirements, the court may impose sanctions as provided in Section 1050.5.

Penal Code § 1050.5 provides:

(a) When, pursuant to subdivision (c) of Section 1050, the court imposes sanctions for failure to comply with the provisions of subdivision (b) of Section 1050, the court may impose one or both of the following sanctions when the moving party is the prosecuting or defense attorney:
(1) A fine not exceeding one thousand ($1,000) upon counsel for the moving party.

(2) The filing of a report with an appropriate disciplinary committee.
(b) The authority to impose sanctions provided for by this section shall be in addition to any other authority or power available to the court, except that the court or magistrate shall not dismiss the case.

The court continued the sentencing hearing to July 1, 1998. (RT 684:4-11.) Defense counsel requested that the court order Officer Mourot to return:

> Your Honor, may we request that you order Officer Robert Mourot back? We're definitely going to want him here. And if you want us to pay his travel expenses—whatever the court deems appropriate. But I know that we're going to run into a problem with a police officer in Little Rock, Arkansas, coming back here. So I request that you order him back and we will try to arrange everything.

(RT 686:3-10.) The court ordered that the costs of Officer Mourot's return be borne by the defense, and that Officer Mourot return if his expenses are paid. (RT 686:11-19.) Petitioner subsequently asked why he was responsible for this expense, and the court stated:

> Well, you don't have to pay for him to come back down and he won't be here. [¶] What's transpired is there was a late request to continue the matter. A witness was paid for by the prosecution to fly out here for purposes of what they believed to be a sentencing hearing today. And in order to ensure complete fairness, . . . I would agree to continue this for two weeks with the understanding that the witness would return.

(RT 691:8-692:4.) The court requested that the court reporter prepare a transcript of that day's proceedings "to assist both counsel in terms of the July 1st date." (RT 692:12-14.)

### 1.    Ineffective Assistance of Counsel

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006). This includes a duty to investigate the prosecution's case and to follow up on any exculpatory evidence that might show a defendant's innocence or raise sufficient doubt to undermine confidence in a guilty verdict. *Kimmelman*, 477 U.S.

at 385; *Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003), *cert. denied*, 543 U.S. 917 (2004).  To show prejudice, petitioner must demonstrate that further investigation would have revealed the favorable evidence.  *Ceja v. Stewart*, 97 F.3d 1246, 1255 (9th Cir. 1996), *cert. denied*, 522 U.S. 971 (1997); *Pizzuto v. Arave*, 280 F.3d 949, 974 (9th Cir. 2002), *amended by*, 385 F.3d 1247 (9th Cir. 2004), *cert. denied sub nom. Pizzuto v. Fisher*, 546 U.S. 976 (2005).

Here, Petitioner has not shown how further investigation by defense counsel would have revealed favorable evidence.  *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001), *amended by*, 253 F.3d 1150 (9th Cir. 2001) (petitioner's speculation that witness might have provided helpful information if interviewed is not enough to support ineffective assistance claim); *see also United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988), *cert. denied*, 488 U.S. 910 (1988) (habeas petitioner alleging ineffective assistance for failure to call witness must show that the witness was actually available and willing to testify).  There is no reasonable probability of changing the court's sentencing decision which was influenced by the federal indictment and surrounding circumstances.  (RT 708:18-709:26, 723:1-730:3.)  Therefore, Petitioner's ineffective assistance of counsel claims fail.  *Strickland*, 466 U.S. at 697; *Ceja*, 97 F.3d at 1255.

### 2.   Due Process

Petitioner argues that the trial court's ruling requiring Petitioner to pay for Officer Mourot's expenses to return for cross-examination denied Petitioner's right to present a defense.  (Am. Pet. at 154-157.)

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)(quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)).  However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions."  *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140

54

1   L. Ed. 2d 413 (1998)(footnote omitted); *see also Montana v. Egelhoff*, 518 U.S.

2   37, 42, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) (plurality opinion).  The right to

3   present evidence "may, in appropriate cases, bow to accommodate other

4   legitimate interests in the criminal trial process."  *Scheffer*, 523 U.S. at 308; *Rock*

5   *v. Arkansas*, 483 U.S. 44, 55, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987).  Thus, for

6   example, the defendant "must comply with established rules of procedure and

7   evidence designed to assure both fairness and reliability in the ascertainment of

8   guilt and innocence."  *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038,

9   35 L. Ed. 2d 297 (1973); *Crane*, 476 U.S. at 690.

10       In this case, Petitioner requested that his counsel seek a continuance on

11   June 16, 1998, one day before the initial hearing.  (RT 663:1-14.)  The request

12   was untimely.  Cal. Penal Code § 1050(b).  Officer Mourot was already en route to

13   California when the motion was faxed to the District Attorney's office.  (CT 264.)

14   Because of the untimely request, the court told Petitioner that the defense would

15   bear the cost of bringing Officer Mourot back for cross-examination.  (RT 691:8-

16   692:4.)  Under the circumstances, the order was not "arbitrary" and did not infringe

17   upon Petitioner's right to cross-examine the witness.  *See Scheffer*, 523 U.S. at

18   308 (Evidentiary rules "do not abridge an accused's right to present a defense so

19   long as they are not arbitrary or disproportionate to the purposes they are

20   designed to serve.  Moreover, we have found the exclusion of evidence to be

21   unconstitutionally arbitrary or disproportionate only where it has infringed upon a

22   weighty interest of the accused.") (citations and internal quotation marks omitted).

23       **L.   GROUND THIRTEEN: Second Sentencing Hearing**

24       Petitioner argues he was denied effective assistance of counsel at his

25   second sentencing hearing because counsel failed to make appropriate objections

26

27

28

and made damaging statements.[30]   (Am. Pet. At 138-161.) All of Petitioner's claims in this ground fail.  Fundamentally, Petitioner is unable to show prejudice under *Strickland*.  There is no reasonable probability that the sentencing decision would have been any different.  (RT 723:1-730:3.)

Petitioner contends that his pre-conviction probation report contained several inaccuracies to which defense counsel failed to object.  First, the probation officer listed Petitioner's residential stability for the last five years as "poor" and stated that Petitioner was "believed to be a transient living a nomadic existence between California and Arkansas." (CT 291-292.) Petitioner argues that competent counsel would have provided the court with records of Petitioner's stable residency.  (Am. Pet. at 138.)  This claim must be rejected as conclusory because petitioner has not shown that the probation officer's statement is inaccurate.  *James*, 24 F.3d at 26; *Jones*, 66 F.3d at 205.

Second, Petitioner contends that the probation officer's report shows two arrests, one on July 17, 1992 for theft by receiving, and one on December 26, 1996, for unlawful taking of a motor vehicle, for which there is "no supporting information." (Am. Pet. at 138; CT 289.)  The report does not suggest either resulted in a conviction; to the contrary, the report indicated there was "no disposition" shown for the former arrest and "charges were ultimately dismissed" in the latter case.  No objection was necessary.  *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance."), *cert. denied*, 519 U.S. 1142 (1997).  More importantly, Petitioner was not prejudiced because these arrests played no role in the court's sentencing decision. (*See* RT 723:1-730:3); *Strickland*, 466 U.S. at 697.

---

[30]  On July 1, 1998, Petitioner informed the trial court that he had retained two new attorneys. (RT 695:17-26.) One of these attorneys represented Petitioner at the continued sentencing hearing.  He will be referred to as defense counsel.

Third, Petitioner complains of the probation officer's statement that, "considering the charges in the present offense and [Petitioner's] past criminal history, it is fair to assume that [Petitioner] is a substance abuser and his drugs of choice are possibly cocaine and/or PCP." (Am. Pet. at 138; CT 290.) Petitioner has not shown how defense counsel was deficient. Not only does the probation report state that Petitioner "admit[ted] to having an addiction to PCP" (CT 300), but in a letter to appellate counsel Petitioner stated, "I do deserve to be in prison . . . but I really don't deserve as much time as I've gotten for the crime that I've committed." (LD 17, Ex. 27.)

Fourth, Petitioner complains that the probation officer's report lists Petitioner's secondary income as "suspected drug sales and theft." (Am. Pet. at 139; CT 293.) Petitioner, however, does not deny that he had been convicted of robbery (RT 350:9-10), and in a letter to appellate counsel, he admitted that most of his life he had been a "small to medium level drug dealer." (LD 17, Ex. 27.) In addition, Petitioner had testified in a prior trial that he had sold fake drugs to Marines. (CT 67.) Petitioner has not shown any deficiency by counsel.

Fifth, Petitioner argues the report incorrectly stated that "[s]ince 1986, approximately age 20, [Petitioner] has amassed a nonstop record of criminal offenses primarily involving drug related offenses and crimes against property . . . . ." (Am. Pet. at 139; CT 294.) However, this statement was corrected by a supplemental report which indicated that petitioner did "not appear to have sustained any new convictions subsequent to his release from state prison in 1991." (CT 301.) Petitioner argues that defense counsel should have provided the court with reports of Petitioner's income from the time of his release from prison in 1991 to his incarceration in the underlying case to dispute the probation officer's theory that Petitioner's secondary income was from suspected drug sales and theft. (Am. Pet. at 139.) Defense counsel did, however, provided the court with a 1996 federal income tax return for Superior Images, one of Petitioner's

companies, as well as the articles of incorporation for that company and another one of Petitioner's companies. (RT 702:24-27, 703:26-704:10.) Defense counsel argued that the filing of tax returns refutes the theory that Superior Images was a "sham" business which was "going to take a loss every year which is just a front for whatever might be earned." (RT 710:26-711:2.)

Additionally, Petitioner argues that, by making the statement, "There ha[d] been a lot of issues raised as to whether or not [Petitioner] has been a law - abiding citizen running these businesses, or whether or not they have been some sort of front," defense counsel became "the first to place in the court's mind that [Petitioner's] businesses may have been some kind of front." (Am. Pet. at 148-149; RT 710:10-14.) There is no factual support for Petitioner's contention. In the first sentencing hearing, Officer Mourot had testified regarding his unsuccessful attempts to locate Superior Images. (See RT 677-679.) Defense counsel brought up this subject to dispute the theory that Petitioner owned "sham" businesses. (See RT 710-711.)

The California Court of Appeal's denial of Ground Thirteen was neither contrary to, nor an unreasonable application of, clearly established federal law.

M.   **GROUND FOURTEEN: Prosecutorial Misconduct**

Petitioner claims the prosecutor committed misconduct in closing argument by (1) arguing that Larry Corn had a motive to lie and that Petitioner knew the PCP was in the car; (2) misstating the law on illegal possession of a controlled substance; and (3) vouching for the credibility of government witnesses. (Am. Pet. at 162-84.) All of these claims fail.

1. **Arguments About Defense Witnesses' Credibility**

Corn testified on cross-examination that he knew Petitioner from "coming to the clubs." (RT 272:9-11.) Petitioner was "considered to be a high roller, a V.I.P." at the Savannah West Club. (RT 273:12-16.) He "sometimes [took] care of [Corn's] people to watch over him," meaning Petitioner gave tips to have

"security," "to have somebody watch over [his] back in case [he was] drinking a little bit too much." (RT 272:22-273:9.) Corn testified that he never received tips from Petitioner. (RT 273:10-11.) During closing argument, the prosecutor argued:

> We all know in our heart of hearts if someone is telling the truth or not. But some of the things that you look for are . . . whether or not they have a bias, interest or motive. [¶] Think about that when you're evaluating Larry Corn's testimony. [Petitioner] is someone that takes care of his people. Does he have a bias, an interest, a motive in coming in here and lying to you?

(RT 484:24-485:4.)

Determining whether prosecutorial misconduct occurred during closing argument requires an examination of the entire proceedings so that the prosecutor's remarks may be placed in proper context. *Boyde v. California*, 494 U.S. 370, 384-85, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990); *Allen v. Woodford*, 395 F.3d 979, 1010 (9th Cir.), *cert. denied sub nom. Allen v. Brown*, 546 U.S. 858 (2005). In other words, in reviewing this type of claim, a court must "examine the likely effect of the statements in the context in which they were made." *Turner v. Calderon*, 281 F.3d 851, 868 (9th Cir. 2002); *Sandoval v. Calderon*, 241 F.3d 765, 778 (9th Cir. 2000), *cert. denied*, 534 U.S. 847, *and cert. denied*, 534 U.S. 943 (2001). Generally, prosecutors must be given wide latitude in their closing arguments to argue reasonable inferences based on the evidence. *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997); *United States v. McChristian*, 47 F.3d 1499, 1507 (9th Cir. 1995).

Petitioner argues that the prosecutor mischaracterized the evidence when she suggested Corn was not credible. (Am. Pet. at 163.) There is no support for this argument. The prosecutor simply inferred bias from Corn's testimony that Petitioner "took care of his people," which she was permitted to do. *See United States v. Mikka*, 586 F.2d 152, 155 (9th Cir. 1978), *cert. denied*, 440 U.S. 921

(1979) (prosecutor's inference regarding the veracity of a witness was proper when based on the evidence properly before the jury).

Petitioner also claims the prosecutor misstated the evidence by arguing: "Did [Petitioner] know [the cigarettes] were there?  Despite what the defense would like you to believe, it's clear, he knew it was there.  It's his.  He's sharing it, probably with his companions."  (RT 478:15-19.)  In addition, Petitioner complains that the prosecutor argued:

> [The] [d]efense would have you believe that [Petitioner] was completely
> ignorant about this PCP existing. . . . Archie Hill says that he purchased
> PCP, some sherms. . . . He bought three.  Isn't that coincidental?  There's
> three people going out.

(RT 480:23-28.)

Petitioner argues the prosecution committed misconduct because there is no evidence that the cigarettes were shared between the parties involved.  (Am. Pet. at 164, 167.)  Once again, the prosecutor here was making a reasonable inference from the evidence.  *Sayetsitty*, 107 F.3d at 1409; *McChristian*, 47 F.3d at 1507.  Hill testified that he bought three cigarettes, and there were three people going out that night, including a mutual friend of both Petitioner and Hill, all in the same car.  (RT 300:13-17, 351-352.)  Petitioner then displayed signs of being under the influence of PCP when he was stopped by the two police officers.  Moreover, the trial court instructed that closing arguments were not evidence.  (RT 475; CT 145); *Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991).

Further, Petitioner argues the prosecutor misstated the evidence by arguing that the PCP cigarettes were "right in front of [Petitioner's] feet."  (RT 480:20.)  Petitioner relies on Officer Azran's testimony that if Petitioner's feet were at the pedals of the car, the PCP would have been six to eight inches behind his feet.  (RT 168; Am. Pet. at 166-67.)  The issue, however, was whether the cigarettes were in a place that would be visible or noticeable to the driver of the car, and they

were in such a place, "directly below the driver's seat right on the floor mat." (RT
167:28-168:3.) Any misstatement was an "isolated moment" in the trial which did
not have a "substantial and injurious effect or influence" on the outcome of the
trial. Again, the trial court instructed that the arguments of counsel were not
evidence. *Duckett v. Godinez*, 67 F.3d 734, 749 (9th Cir. 1995), *cert. denied*, 517
U.S. 1158 (1996); *Hall*, 935 F.2d at 165-66.

### 2. Misstating the Law

During closing argument, the prosecutor stated:

So let's go to counts 1 and 4–possession of a controlled substance. Did
[Petitioner] possess phencyclidine, the cigarettes that were found right
underneath where his feet were in his own car. [¶] Well, the law defines it in
a specific way–did he control or have a right to control the controlled
substance. Possession doesn't mean that you have to have it in your hand
or in your pocket or in your book bag or anything like that. If it's anywhere
that you have control over it, you possess it.

(RT 478:5-14.)

Petitioner claims that the prosecutor omitted the additional elements of
control over the controlled substance, knowledge of its presence and its nature as
a controlled substance, and the substance was in an amount sufficient to be used
as a controlled substance. (Am. Pet. at 164.) There is no factual support for this
argument. The prosecutor did include the element of control. In addition,
immediately after the above statement, the prosecutor discussed the other
elements that Petitioner claims were omitted:

Did [Petititioner] know it was there? Despite what the defense would like you
to believe, it's clear, he knew it was there . . . [¶] He has knowledge of its
nature, he knows that it's illegal. [¶] The substance was in an amount
sufficient to be used. . . . [¶] [O]ne of those cigarettes[] is an amount
sufficient.

(RT 478:15-479:2.)

### 3. Improper Vouching

Petitioner claims that the prosecutor improperly vouched for the credibility of the police officers when she argued:

> No matter what the toxicologist--who got $2,000 plus for his testimony for one hour--no matter what he tells you, the only people that saw [Petitioner] that night, the only credible people are the two officers that came in and said, "Look we know what this stuff smells like." [¶] And we know it has an odor because even the chemist came in and said, "Yes, it has an odor. It has a distinct odor." . . .

(RT 482:13-23.) In addition, the prosecutor argued:

> . . . [T]he police officers showed the drugs in [Petitioner's] presence [and,] . . . according to [Petitioner], talked about them in front of him. Did he say . . ., "Those are not mine . . . [?]" [¶] Well, the officer testified [Petitioner] didn't say anything . . . [Petitioner] would have you believe he denied it, but if he did deny it, the officer would tell you he denied it. The officer does not know this man, does not have any reason to make up something that didn't occur.

(RT 496:19-497:2.; Am. Pet. at 168-69, 175-77.)

"Improper vouching occurs where the prosecutor places the prestige of the government behind a witness by expressing his or her personal belief in the veracity of the witness, or . . . indicates that information not presented to the jury supports the witness's testimony." *United States v. McKenna*, 327 F.3d 830, 842 (9th Cir.)(internal quotation marks omitted), *cert. denied, 540* U.S. 941 (2003); *United States v. Young*, 470 U.S. 1, 17-19, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985). Here, the prosecutor did neither. She argued that the officers were credible based on the substance of their testimony (*e.g.,* because they knew, from experience, what PCP smells like), and lack of motive.

62

### N.    GROUND FIFTEEN: Insufficient Evidence

Petitioner argues that the convictions on Counts 1 and 4 must be reversed because there was insufficient evidence that he knowingly possessed and transported PCP.  (Am. Pet. at 193.)  The state courts' rejection of this claim was reasonable.

To review the sufficiency of the evidence, the Court must determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Lewis v. Jeffers*, 497 U.S. 764, 781, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990) (citation omitted); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  All evidence must be considered in the light most favorable to the prosecution, *Lewis*, 497 U.S. at 782, and if the facts support conflicting inferences, reviewing courts "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326; *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (per curiam).  Furthermore, under the AEDPA, federal courts must "apply the standards of *Jackson* with an additional layer of deference." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1142 *and* 126 S. Ct. 1145 (2006).  These standards are applied to the substantive elements of the criminal offenses under state law. *Jackson*, 443 U.S. at 324 n.16; *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir.) (en banc), *cert. denied*, 543 U.S. 956 (2004).

"In performing a *Jackson* analysis, circumstantial evidence and inferences drawn from [the record] may be sufficient to sustain a conviction," but "mere suspicion or speculation cannot be the basis for creation of logical inferences." *Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir. 2007) (internal quotations omitted); *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).  In addition, "under *Jackson*, the assessment of the credibility of witnesses is generally beyond

1  the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330, 115 S. Ct. 851, 130 L.

2  Ed. 2d 808 (1995) *Bruce*, 376 F.3d at 957.

3       "The essential elements of possession of a controlled substance are

4  dominion and control of the substance in a quantity usable for consumption or

5  sale, with knowledge of its presence and of its restricted dangerous drug

6  character." *People v. Palaschak*, 9 Cal. 4th 1236, 1242, 40 Cal. Rptr. 2d 722

7  (1995); *People v. Martin*, 25 Cal. 4th 1180, 1184, 108 Cal. Rptr. 2d 599 (2001).

8  Each of these elements may be established circumstantially. *Palaschak*, 9 Cal.

9  4th at 1242 (citations omitted); *Martin*, 25 Cal. 4th at 1184.  Similarly, conviction of

10  a violation of Cal. Health & Safety Code § 11379.5 "requires proof of both

11  possession and knowledge of the character of the material possessed." *People v.*

12  *Colds*, 125 Cal. App. 3d 860, 863, 178 Cal. Rptr. 430 (1981).  The defendant's

13  knowledge may be inferred from the circumstances. *Id.*

14       Here, the California Court of Appeal held there was ample evidence that

15  Petitioner knowingly possessed and transported PCP:

16       The undisputed evidence is that each of the two cigarettes contained

17       PCP in a usable amount. [Petitioner] necessarily exercised "dominion and

18       control" over the PCP.  The cigarettes were found on the floorboard directly

19       in front of the center of the driver's seat. This was where [Petitioner] sat, and

20       he was the sole occupant when the vehicle was stopped.

21       [Petitioner] admitted he would recognize PCP on sight, because he

22       had seen PCP before and was aware of the odor associated with PCP. He

23       also admitted that he knew people who smoked PCP. Moreover, the jury

24       was entitled to take into account his refusal to take a urine test as

25       consciousness of guilt.  Based on this evidence, the jury could infer that

26       [Petitioner] knew of PCP's "restricted dangerous drug character."

27       Similarly, the jury was entitled to disbelieve [Petitioner's] disclaimer

28       that he was unaware the PCP cigarettes were in his car and find, instead, he

necessarily knew of their "presence" based on the totality of the circumstances. [Petitioner] admitted an officer showed him the tin-foil packet and said, "look what we have here." He denied knowing what it was the officer displayed. However, the officer's uncontroverted testimony establishes the PCP cigarettes were clearly visible, because "[t]he foil was partially opened and so you could see the two cigarettes inside[.]" Also, the PCP character of the cigarettes was readily apparent, because "[w]hen cigarettes are dipped in PCP, they become . . . very dark[,] like a brown color" and "also have that wet appearance as well." [Petitioner] admitted he would recognize PCP when he saw it. Additionally, as discussed above, he was the car's lone occupant, and the PCP was found directly in front of his seat.

*Miller*, 2001 WL 1528644 at *3.

As the Court of Appeal discussed, the PCP cigarettes were directly below the driver's seat, about six to eight inches behind Petitioner's feet. (RT 167:15-168:10.) Petitioner was the only person in the car. (RT 158-159.) The foil in which the cigarettes were wrapped was partially open, such that one could see the cigarettes inside. (RT 167:17-21.) Petitioner admitted he had seen PCP, would recognize it if he saw it, was familiar with the odor associated with it, and knew people who smoked it. (RT 369:16-370:3.) Petitioner refused to take a urine test despite being told that the refusal would be used against him as an indication of his consciousness of guilt. (RT 178:13-17.) Although Petitioner contends the refusal could have been attributed to an attempt to avoid the detection of alcohol (Am. Pet. at 188), he was informed that the sample would be used to determine the presence of a controlled substance in his body and that he was being arrested for being under the influence of PCP. (RT 177:17-178:22, 181:5-9.) From this evidence, it was reasonable to conclude that Petitioner had dominion and control over the PCP cigarettes, knew of their presence in his car, and knew of their

restricted dangerous character.  The jury, moreover, was entitled to disbelieve Archie Hill's testimony that the cigarettes were his and Petitioner's testimony that he was unaware of them prior to his arrest.  (RT 312:28-313:5, 362:1-16.) Accordingly, the California Supreme Court's denial of Ground Fifteen was neither contrary to, nor an unreasonable application of, clearly established federal law.

### O.   GROUND SIXTEEN: Cruel and Unusual Punishment

Petitioner contends that his sentence of 25 years to life for Count 1 (CT 278), a non-violent possession offense, constitutes cruel and unusual punishment under the Eighth Amendment.  (Am. Pet. at 194.)  The state courts reasonably rejected this claim.

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" *Ewing v. California*, 538 U.S. 11, 20, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 996-97, 111 S. Ct. 2680, 115 L. Ed. 2d 856 (1991) (Kennedy, J., concurring)); *see also Lockyer v. Andrade*, 538 U.S. 63, 72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) ("Through the thicket of Eighth Amendment jurisprudence, one governing legal principle emerges as 'clearly established' under § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years."). However, "[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case." *Andrade*, 538 U.S. at 77; *Nunes v. Ramirez-Palmer*, 485 F.3d 432, 439 (9th Cir. 2007).

California's Three Strikes law was "designed to increase the prison term of repeat felons." *Ewing*, 538 U.S. at 15 (citation and internal quotation marks omitted).  Under the Three Strikes law:

> "[w]hen a defendant is convicted of a felony, and he has previously been convicted of one or more prior felonies defined as 'serious' or 'violent' [under California law], sentencing is conducted pursuant to the

three strikes law. . . .  [¶]  . . . If the defendant has two or more prior 'serious' or 'violent' felony convictions, he must receive "an indeterminate term of life imprisonment."

*Id.* at 15-16 (citations omitted).  While the prior "strike" convictions must be for "serious" or "violent" felonies, "any felony can constitute the third strike, and thus can subject a defendant to a term of 25 years to life in prison." *Andrade*, 538 U.S. at 67.

In *Andrade*, the Supreme Court held two consecutive sentences of 25 years to life on two counts of petty theft with a prior conviction did not violate the Eighth Amendment.  In *Ewing*, the Supreme Court held a sentence of 25 years to life on felony grand theft was not grossly disproportionate. *Andrade*, 538 U.S. at 76; *Ewing*, 538 U.S. at 30-31.  In *Harmelin*, a sentence of life in prison without the possibility of parole for possession of more than 650 grams of cocaine, without consideration of mitigating factors, such as the fact that the petitioner had no prior felony convictions, did not constitute cruel and unusual punishment.  *Harmelin*, 501 U.S. at 994-95.  Here, although Petitioner's conviction for possession of PCP is a "wobbler," *i.e.*, a crime for which either a misdemeanor or a felony punishment may be appropriate, Cal. Health & Safety Code § 11377(a), Petitioner's prior convictions were for the serious and violent felony of attempted murder, robbery, and assault with a deadly weapon.  (RT 592:19-593:2.).  Under these circumstances, the Supreme Court's decisions in *Ewing*, *Andrade*, and *Harmelin* compel the conclusion that Petitioner's sentence was not grossly disproportionate to his crime in light of his criminal history, and the California Supreme Court correctly concluded that *Harmelin* precluded relief. *Miller*, 2001 WL 1528644 at *5.  The California Supreme Court's decision affirming his sentence was neither contrary to, nor an unreasonable application of, clearly established federal law.

**P.    GROUND ONE: Ineffective Assistance of Appellate Counsel**

In Ground One, Petitioner claims appellate counsel provided constitutionally ineffective assistance. (Am. Pet. at 1-4.) Petitioner does not identify any specific omissions or mistakes on the part of his appellate counsel. "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James*, 24 F.3d at 26; *Jones*, 66 F.3d at 205 (same).

Even assuming Ground One is a catch-all for all other grounds in the Amended Petition, Petitioner's claim still fails. The *Strickland* test also applies to claims of ineffective assistance by appellate counsel. *See Smith v. Murray*, 477 U.S. 527, 536, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986); *see also Smith*, 528 U.S. at 285-86 ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*"). The test for deficient performance is the same as for trial counsel. *Id*. at 285 (petitioner "must first show that his counsel was objectively unreasonable"). To establish prejudice, a petitioner "must show a reasonable probability that, but for his counsel's [error], he would have prevailed on his appeal." *Id*. (citation omitted).

Appellate counsel has no constitutional duty to raise every issue where, in the attorney's judgment, the issue has little or no likelihood of success. *Jones v. Barnes*, 463 U.S. 745, 751-53, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) (limited on other grounds in *Smith*, 528 U.S. at 287, 120 S. Ct. at 765). Indeed, as an officer of the court, appellate counsel is under an ethical obligation to refrain from wasting the court's time on meritless arguments. *McCoy v. Wisconsin*, 486 U.S. 429, 436, 108 S. Ct. 1895, 100 L. Ed. 2d 440 (1988). Appointed appellate counsel is not required "to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Barnes*, 463 U.S. at 751. "There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review." *Id*. at 752. In reviewing appellate

counsel's performance, the court will presume that appellate counsel used reasonable tactics; otherwise, it "could dampen the ardor and impair [counsel's] independence . . . , discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir. 1997) (citing *Strickland*, 466 U.S. at 690).

Given that all of Petitioner's other grounds are meritless, appellate counsel was not deficient in failing to raise them and there is no prejudice. *Barnes*, 463 U.S. at 751-54; *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). The California Court of Appeal thus reasonably rejected Ground One.

### Q.    **Petitioner's Request for an Evidentiary Hearing**

Petitioner requests an evidentiary hearing. Because Petitioner has not demonstrated any basis for federal habeas relief, no evidentiary hearing is necessary. *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940, 167 L. Ed. 2d 836 (2007) ("if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing").

### V.

### **RECOMMENDATION**

For the foregoing reasons discussed above, it is recommended that the District Court issue an Order (1) adopting this Report and Recommendation; and (2) directing that judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: October 9, 2007

*Alicia G. Rosenberg*
ALICIA G. ROSENBERG
United States Magistrate Judge

## NOTICE

Reports and Recommendations are not appealable to the Court of Appeals, but are subject to the right of any party to file Objections as provided in the Local Rules Governing Duties of Magistrate Judges, and review by the District Judge whose initials appear in the docket number. No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the Judgment of the District Court.